Wilson v. State.

WILSON *v.* STATE.

(*Knoxville.* September Term, 1902.)

109   167
117   243
117   515

**1. JUROR.** What opinions disqualify—what do not.

Opinions which disqualify a juror are such as are formed upon personal knowledge, from the statements of witnesses or of those who have heard the testimony or statements of witnesses and repeat them, or from published accounts of the statements of witnesses; and opinions formed from other sources are based upon rumor and do not disqualify. (*Post, p.* 170.)

Cases cited:   Woods *v.* State, 99 Tenn., 187; Turner *v.* State, 69 S. W. Rep. (Tenn.), 778.

**2. CHARGE OF COURT.** Inartificial definition of "reasonable doubt" not reversible error, when.

The charge of the trial judge, defining "reasonable doubt" as "such doubt as will create in the minds of the jury a feeling of unrest, or misgiving on the part of the jury, and which will not permit their minds to rest easy upon a verdict of guilty," was not prejudicial, and therefore not reversible error, and especially is this so when the undisputed facts, including the statements of the defendant, clearly establish his guilt. (*Post, pp.* 170-171, 177.)

**3. TRIAL JUDGE.** Statements of to jury, not reversibel error, unless prejudicial to defendant.

The supreme court will not reverse for supposed misconduct of the trial judge in his statement to the jury respecting the time for the deliverance of their verdict, when it is plain that such statement could not operate to the prejudice of the defendant. (*Post, pp.* 171-172.)

**4. MURDER.** Verdict for, supported by facts.

A verdict of guilty of murder in the second degree, and fixing the punishment of defendant at twenty years' confinement

Wilson v. State.

in the penitentiary, is abundantly sustained by the facts set out in the opinion. (*Post, pp.* 172-176.)

**5. TECHNICALITIES. Not favored by courts.**

There is a strong and growing inclination upon the part of the supreme court, repeatedly announced, to escape from the embarrassments of technicalities that are "empty and without reason" and "tend to defeat law and right." (*Post, pp.* 176-180.)

Cases cited and approved: Isham *v.* State, 1 Sneed, 11; Hale *v.* State, 1 Cold., 167; Wallace *v.* State, 2 Lea, 35; State *v.* Staley, 3 Lea, 565; Woods *v.* State, 14 Lea, 460; Glidewell *v.* State, 15 Lea, 133; Givens *v.* State, 103 Tenn., 650.

**6. SAME. Shall not protect guilty—No reversal except for errors affecting merits.**

The day is past for rescuing the guilty by mere technicalities, and when guilt is clearly established, and the merits have been reached, there will be no reversal except for substantial errors which have deprived defendant of some constitutional or legal right. (*Post, pp.* 176-180.)

Code construed, Secs. 6351 (S); 5268 (M. & V.); 4516 (T. & S.).

---

FROM CLAIBORNE.

---

Appeal in error from Circuit Court of Claiborne County. JOHN W. TIPTON, Special Judge.

H. Y. HUGHES, W. A. OWENS and ROGERS & ROGERS, for Wilson.

CHARLES T. CATES, JR., Attorney-General, for State.

MR. JUSTICE WILKES delivered the opinion of the Court.

Defendant was convicted of murder in the second degree, and sentenced to the penitentiary for twenty years, and has appealed. In his behalf it is said that he has not had a trial before a fair and impartial jury, such as the constitution and law of the land contemplate. The specific objection is over the fact that Richard Rider, W. H. Farmer, and four others, whose names are not given, were not competent and impartial in that they stated when examined on their *voir dire* that they had formed and expressed opinions touching the guilt or innocence of the defendant. They stated that they had heard a great deal about the case, lived in the locality of the killing, had heard persons state how the killing occurred, but did not know whether the persons who made the statements knew of the facts or not; that they had formed their opinions from these statements, but that, if selected as jurors, they could and would wholly disregard the opinions, and try the case alone on the law and evidence, and do equal and exact justice between the State and the defendant; that they would, however, go into the jury box with their opinions; and that it would take evidence to remove them. These parties were objected to as incompetent and disqualified for jury service, and were offered to be challenged for cause; but the court held them competent, and, being acceptable to the State, defendant was forced to peremptorily challenge them, and in this way exhausted his challenges, and was

refused any others on that ground.   Defendant, hav-
ing exhausted all his challenges before the jury was
made up, was forced to accept as a juror one C. A.
Guy, whom he desired to challenge, and who was
selected and impaneled as a juror over his protest
and challenge.

This matter has been often before this court, and
its latest deliverance upon the questions involved
is embodied in the case of *Turner* v. *State*, 69 S. W.,
778, 779, where the cases are reviewed and comment-
ed on at some length.   It is only necessary to say
that the opinions which disqualify a person from
being a juror are such as are formed from the per-
sonal knowledge of the juror, the statements of wit-
nesses, or of those who have heard the witnesses,
and who repeat what they have heard, or from pub-
lished accounts of the statements of witnesses; and
opinions formed from other sources are based upon
rumor, and do not disqualify.   *Woods* v. *State*, 99
Tenn., 187 (41 S. W., 811).

It is said the court erred in defining "reasonable
doubt" as "such a doubt as will create in the minds
a feeling of unrest or misgiving on the part of the
jury, and which will not permit their minds to rest
easy upon a verdict of guilty."

While we think that no definition of "reasonable
doubt" is so plain and unambiguous and easily
understood as the mere words themselves, we think
there is nothing in the definition given that would

constitute error, or prejudice the jury against defendant; and especially is this so in view of the undisputed facts of this case, and of the statements of the defendant himself.

It is said the court erred in this. The jury were charged early Tuesday morning, and retired to consider of their verdict. About 12 o'clock they returned, and reported no agreement, and were again sent out for further deliberations. About 4:30 p. m. the jury again came in, and reported that they had not been able to agree. The court inquired if there was any chance for them to agree, to which they replied that they were nearer together than at the time they first came in. The court said to them that he would send them out again, and asked them to agree that evening if they could, and said to them, if they could agree that evening, before bedtime, to let him know, and he would receive their verdict and discharge them, but that they could return to the hotel and spend the night, and he would allow them pay for next day. The jury then retired, and the court immediately adjourned for the day. Very soon the jury, through its officer, let the judge know that they had agreed; and after supper the court reconvened, and the jury brought in and reported the verdict, and were discharged.

Now, while this was an irregular proceeding, and while it was beyond the province of the trial judge to promise the jury pay for time they might not

serve, yet we can not see that it could operate to the prejudice of the defendant. It may have influenced the jury to report earlier than they otherwise would, and possibly to agree more promptly upon their verdict, but we are unable to see how it could have influenced them to find a verdict they otherwise would not have found.

The trial judge had a right to convene the court at any time he thought best in the proper discharge of the business of the term, and the only criticism to be made of his action was his promise to allow per diem that might not be due the jury; but we are unable to see that this prejudiced the defendant, or led the jury to return a verdict different from what they would have returned. At most, the proceeding was an irregularity that we can plainly see did not affect the merits of the case.

It is said the facts in the case do not justify a verdict for a higher grade of offense than voluntary manslaughter, and that a verdict for murder in the second degree is not warranted by the evidence.

The defendant is a young man, about twenty-seven years of age. He ascertained that a party of fishermen were dynamiting for fish in Clinch river, and he joined them on Tuesday evening. His version is that about dark they persuaded him to get them some whisky, and he went on the search for it, and was so engaged all night, returning about daylight; when the party drank a part of the two gallons which de-

fendant had procured. Sharp, one of the fishing party, gave defendant his pistol to keep for him. Defendant drank somewhat freely of the whisky, but does not claim that he was drunk. With two other men he was walking down the river bank, when the deceased, whom the defendant did not know, was over in the bottom, on the other side of the river, hallooing to the party about their being indicted for dynamiting. The deceased started up the bank on the other side when defendant hailed him. Defendant says: "I thought he was too far away for me to hit him, and I pulled out my pistol, and threw it out and shot over towards him twice. I had no thought of hitting or hurting the man. I shot with Sharp's pistol, which was a 38, old model, short Smith & Wesson pocket pistol, and which I had never shot before, and had never seen fired. I fired two shots in quick succession. Don't remember of taking sight, or moving out of the smoke of the first shot in order to make the second. I had no reason for firing the shots, except that I had been up all night, had slept none, was drinking, and had no earthly thought of hitting or hurting any one. The fact is, the whole matter ever since then has been like a dream to me. Deceased was doing nothing to me. After the killing I went away, fearing I might be lynched."

This is defendant's own version. From other evidence it appears that deceased was at work on his father's farm, near the river, and had occasion to

go to a spring on the river bank for drinking water. While there he discovered the party fishing with dynamite, and after he started to return to his work, and had gotten upon ground higher than where the spring was located, he hallooed to the party: "Gentlemen, you had better quit that and go home, or you will every one be indicted before the week is out." At that time some of the party were in a canoe or boat, and three men came towards them down the river bank, when the defendant, who was the hindmost man of the three, drew a pistol and fired at deceased twice in rapid succession; one ball taking effect about the waistband of deceased's pants, passing entirely through his body, and lodging against the skin on the opposite side. The deceased did not know the man who shot him, nor did defendant know the man whom he shot. It is further shown in the proof that defendant said before he shot, "Look at that damned rascal over there on the bank," and then fired the two shots in quick succession. After the second shot, he said, "How do you like that?" or, as another witness says, "Do that, and see how you like it." Another witness states that, after deceased said what he did about the dynamiting, the defendant said, "Go away from there, you damned son of a bitch, or I will start you," and immediately fired the two shots in rapid succession. Immediately after the shooting, defendant asked his companions who lived over there, and, on being told that it was the farm of deceased's

father, he inquired if he had any money, and, on being told that he had a good farm and was a good liver, he replied, "If they were to catch me, my neck would pay the debt, wouldn't it?"   He thereupon left his companions and fled to Virginia, while they were arrested for the homicide, and he was afterward arrested.   The distance of defendant from the deceased when the shots were fired was about 200 yards; the defendant being on one side of the Clinch river, in Claiborne county, and the deceased on the other, in Grainger county.

Upon the record as thus made, and with a charge to which no exception is offered, the jury found the defendant guilty of murder in the second degree, and sentenced him to twenty years in the State penitentiary.

The testimony of defendant alone, putting the most favorable construction upon it possible, would have amply justified the verdict.

It is difficult to see how even a plausible argument can be made by astute counsel that the conviction in this case should have been for a less degree of crime than murder in the second degree, or that the punishment should be less.   In all the annals of criminal trials, it would be difficult to find an instance of such inexcusable, unprovoked, wanton and reckless homicide as this case presents.

Taking defendant's own theory of the case, and putting on it the most charitable construction, he in-

dulged himself in the pastime of making a target of his fellowman to test his marksmanship, and the only excuse he can offer is that he had no idea he would kill his victim at such a distance. He does not even claim credit for being drunk upon the occasion, though he states that he had been drinking freely. His conduct before and after the shooting, his remarks in regard to being hung for it, his accuracy of aim, all negative the idea of any drunkenness, and cut off even this poor pretense of an excuse, so often urged as a defense. When we add to his statement, which is bad enough, that of other witnesses that he deliberately shot the first shot, and moved to one side, out of the smoke, to be more certain of the second; that he used vile and abusive language to the deceased before and at the time he shot, and who had said and done nothing to him, and, at most, had only given a kindly warning to his companions that they were subjecting themselves to indictment; that he took a malicious pleasure in watching the results of his shots —stamp the case as one of the most utter and inexcusable recklessness and disregard for the rights and life of his fellowman; and the jury would have been amply justified in finding him guilty of a much higher offense, and even of visiting upon him the extreme penalty of the law, upon the theory that he entertained express malice against the deceased because of his attempted interference with the dynamiting proceedings. To reverse such a case upon a mere techni-

cality or irregularity would be a travesty upon the administration of the law.

With what consistency can it be said the defendant has not had a fair trial before an impartial jury, when they have given him the punishment for murder in the second degree for an unprovoked and totally inexcusable homicide?

The jury, in their verdict, have leaned largely to the side of mercy, instead of meting out to the defendant punishment which the grade of his offense might have warranted.

Again, how can it be said that there could possibly be in the minds of the jury a doubt which would cause a feeling of unrest or misgiving as to their verdict, and where can be found any evidence that the jury was misled by the definition given of "reasonable doubt?"

Again, where is there an indication that the action of the trial judge in convening the court after adjournment for the day in order to receive the verdict, or in his unauthorized statement that they would receive an extra day's per diem, led to the prejudice of the defendant?

A full and sufficient answer to all these irregularities, if we should class them as such, is the fact that defendant was given a verdict of murder in the second degree, and a sentence of twenty years, when the record clearly justified the verdict and sentence, and might have warranted a conviction for a higher of-

fense. Even if the matters complained of were errors, as defendant's counsel so earnestly insist, they are shown to be immaterial and harmless by the verdict itself.

When the evidence is plain and convincing, and no plausible excuse can be offered, and it is apparent that an inexcusable and unprovoked crime has been committed, this court, in the interest of the public good, and in order to subserve the public welfare and preserve the peace of society, will not permit an offender to escape through mere irregularities and technicalities, nor even through errors which it can see have not operated to the prejudice and hurt of the defendant.

The processes of the court and the manner and mode of the trial are intended to develop the main question of the guilt or innocence of the defendant, and when the guilt appears plainly, unequivocally, and beyond all doubt, this court will not reverse, unless grave errors have been committed, which would change the record, and show the defendant either not guilty, or put his guilt in doubt. While it is the desire of this court that no innocent men shall suffer for want of a fair trial, it is the duty of the court at the same time to see that no guilty one shall escape through a mere irregularity or technicality that does not and can not affect the merits, which in every criminal case is the guilt or innocence of the accused.

This is the doctrine voiced by the general assembly as early as the act of 1809, and kept upon our statute books continuously since for nearly 100 years, and now embodied in section 6351 of Shannon's compilation, as follows: "No judgment, decision or decree of the inferior court shall be reversed in the supreme court unless for errors which affect the merits of the judgment, decision or decree complained of."

The same rule has been repeated and reiterated from time to time by this court.

In the case of *Isham* v. *State,* 1 Sneed, 111, the court, speaking through Judge Caruthers, said: "The day is past for rescuing the guilty by mere technicalities."

In the case of *Hale* v. *State,* 1 Cold., 167 (78 Am. Dec., 488,) the same judge said: "The inclination now, both of the legislature and the courts, is not to screen the guilty by artificial and unmeaning rules and distinctions, but to see that the law is enforced against the guilty."

In the case of *Wallace* v. *State,* 2 Lea., 30, Judge Turney said: "While the courts as strictly now as at any time in the history of the jurisprudence of the State adhere to technicalities when they involve or contain principle, yet when they are empty and without reason, and tend to defeat law and right, they are no longer regarded."

In the case of *State* v. *Staley,* 3 Lea, 565, Judge Freeman said: "The day for escaping the conse-

quences of crime on mere technicalities, not going to the protection of essential right, has gone by, and violators of law had as well accept the fact, and act accordingly."

In *Woods* v. *State,* 14 Lea, 460, Judge Freeman said: "The courts in this enlightened age ought not to be asked to put on judicial spectacles in order to darken or distort the meaning of language. The age of all this is past."

In the case of *Glidewell* v. *State*, 15 Lea, 133, Wilson, special judge, said: "We will uphold all technical rules that subserve the honest end of protecting the just rights of prisoners to a fair and impartial trial under the constitution and the law. We will not enforce trivial ones, not the mandate of the constitution or of the statutes, which are of use and can be of use alone to enable the guilty to escape, or to delay the sentence of just punishment."

In the case of *Givens* v. *State,* 103 Tenn., 650 (55 S. W., 1108), Judge Beard said: "There is a growing inclination on the part of this court, repeatedly announced, to escape from the embarrassments of technicalities that tend to defeat law and rights."

We only wish to add, where guilt is clearly established, and the merits have been reached beyond all doubt, there will be no reversal, except for substantail errors which deprive the defendant of some constitutional or legal right.

The judgment of the court below is affirmed, with costs.