IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

AT JACKSON

MAY 1997 SESSION



**FILED**

**December 10, 1997**

**Cecil Crowson, Jr.**
Appellate Court Clerk

| | | |
|---|---|---|
| STATE OF TENNESSEE, | * | C.C.A. # 02C01-9608-CR-00282 |
| Appellee, | * | SHELBY COUNTY |
| VS. | * | Hon. W. Fred Axley, Judge |
| JOHN KNAPP, | * | (Attempted Second Degree Murder) |
| Appellant. | * | |

For Appellant:

Charles R. Curbo, Attorney
109 Madison Avenue
Memphis, TN 38103

For Appellee:

John Knox Walkup
Attorney General & Reporter

Kenneth W. Rucker
Assistant Attorney General
450 James Robertson Parkway
Nashville, TN 37243-0493

Alanda Horne
Assistant District Attorney General
Criminal Justice Center, Third Floor
201 Poplar Avenue
Memphis, TN 38103

OPINION FILED:_____

AFFIRMED

GARY R. WADE, JUDGE

## OPINION

The defendant, John Knapp, was convicted of attempted second murder. The trial court imposed a Range I, ten-year sentence. In this appeal of right, the defendant claims an entitlement to a new trial on several grounds, including that the trial judge precluded an effective cross-examination of the victim and improperly commented on the evidence. Although counsel for the defendant failed to enumerate other grounds in his appellate brief, there are references to possible other issues; included is an alleged violation of the rule of sequestration of witnesses.

We affirm the judgment of the trial court.

In 1994, the defendant vacated a residence at 1609 Stribling in Memphis and the victim, Kevin Newburn, moved into the same residence. The defendant and the victim had been friends and the defendant left the refrigerator for the victim's use. Later, however, a dispute arose and the defendant gave notice to the victim that he intended to regain possession of the item. Over a period of time, the relationship between the defendant and the victim deteriorated to the point that the defendant had to arrange for Ronnie Jackson, who lived near the victim, to help him re-obtain the refrigerator.

On February 6, 1995, Jackson and his stepson, Phillip, moved the refrigerator from the victim's residence. Once the refrigerator was outside, the defendant joined in the effort to move it into the Jackson residence. As the refrigerator was maneuvered up a step, however, the door opened and several items of spoiled food fell out. The defendant then threw the spoiled food over a fence into the victim's front yard. The victim heard the noise, walked outside his

2

residence, and observed dents in his vehicle which was parked near where the food was thrown. The victim then picked up the garbage and threw it back. The victim testified that when he returned to his residence, he heard a "loud boom" and so he "came back outside and ... shot [his own weapon] up in the air." Otherwise, the victim denied having made any threats toward the defendant at that point. Shortly after this episode, two police cars arrived next door to talk to the defendant. They left, however, without making any arrests.

On the next day, the victim, who worked for a security company in addition to his duties with the United Parcel Service, was assigned to the apartment complex where the defendant lived. The victim, dressed in a security guard uniform, was unarmed as he patrolled his vehicle through the apartment complex. Shortly before noon, the victim saw the defendant's sister, Melissa Montgomery, as she was leaving the apartments. The victim testified that he asked Ms. Montgomery "what was up" with the defendant and his behavior the day before. According to the victim, Ms. Montgomery answered that the defendant was "crazy" and that the victim just needed "to leave him alone."

The victim testified that a short while later he observed the defendant drive through the apartment complex. He recalled that he refused a demand by the defendant that he roll down his car window. What happened thereafter is best reflected in the victim's testimony:

> So I just ... looked over there and when I looked back, ...
> I saw the infrared beam and I saw him pointing that gun
> at me. And I was just sitting.... [W]hen I saw that beam
> ... it just froze me. I didn't know [if] this guy [was] going
> to pull this trigger or ... not.... [I]t hit my head and came
> down. After [it] hit the bottom of my eye, I ... just kind of
> ... closed my eyes and heard a boom.... I went over into
> the seat and blood ... was just running profusely out of
> my mouth and I couldn't stop it, so I just drove off. I just
> hit the gas. I didn't know what to do because he took off

3

real fast.... So I started blowing the horn because I felt myself getting weak and I just knew I was going to pass out and I wouldn't make it to the office or make it anywhere. As I looked to my left, he had come back around beside me and it was like he was either waving that gun or waving his hand at me.... [I] drove to the leasing office, got out, and I walked to the door and told her, ... "call 911, I've been shot." Blood [was] just running like a water faucet.

The defendant testified that on the day before the shooting, he had complained to the police about the victim having thrown the garbage back into the Jacksons' yard. He contended that the victim caused damages to his vehicle of almost $1,000.00. On the day of the shooting, the defendant attempted to take out a vandalism warrant against the victim. When he told officers that the damage to his vehicle was over $500.00, however, he learned that more information would be required because the charge would be a felony rather than a misdemeanor. A short while later, the defendant learned that his sister, whom he described as "hysterical," had talked to the victim. He claimed that she suggested that he needed to "go and check" on the victim. The defendant then drove to his apartment complex "to check and make sure somebody was not breaking into my apartment to steal my stereo equipment."

The defendant testified that when he arrived, he saw the victim and asked, "[W]hat the hell [are you] doing in my apartment complex?" The victim answered that he was a security guard. According to the defendant, the victim then instructed him not to come into the neighborhood, else "he would make it so I was unable to walk." The defendant claimed that the victim then said, "Boy, I ought to go ahead and take care of you now" and then picked up a gun. The defendant, still inside his vehicle, testified that he leaned over, saw a gun on his floorboard, put a bullet in the chamber, hurriedly fired his weapon, and then drove away. The

4

defendant explained that he thought the victim "was going to shoot me." Afterward, the defendant drove to his place of employment, informed his boss what had taken place, and then drove to the "East Precinct" of the police department.

No weapon other than that of the defendant was discovered by police. The victim's car window was shattered as he was struck in the chin by a bullet. A spent cartridge was later located on the window wiper of the defendant's car. Expert testimony on the firearm indicated that the gun was being held outside the car window at the time the shot was fired.

The defendant makes no challenge to the sufficiency of the evidence. Second degree murder, a Class A felony, is "a knowing killing of another." Tenn. Code Ann. § 39-13-210. Because the victim survived the shooting, the crime was one of attempt. Tenn. Code Ann. § 39-12-101. The felony grade, Class B, is one degree lower. Tenn. Code Ann. § 39-12-107. Certainly, it is our view that the recorded evidence is sufficient to support the jury's verdict.

In this appeal, the defendant contends that the trial court made a number of errors; however, he has failed to categorize his arguments. He complains that the trial judge ridiculed and threatened his defense counsel, thwarted the cross-examination of the victim, and generally precluded the presentation of a proper defense.

The defendant cites as the most egregious example of this the instructions made by the trial court to the jury after defense counsel attempted to cross-examine the victim about the nature of earlier statements made for worker's compensation and victims to crimes compensation purposes. When the issue was

raised, the trial court charged the jury as follows:

> There is an attempt to impeach a witness on a prior inconsistent statement. When I charge you, ... I'll explain to you what that means. But in order for the witness to be impeached on a prior inconsistent statement, the lawyer trying to do that must have in his hand the statement.
>
> The court ... just learned that they don't have it, but will have it sometime today, within an hour is what I was told. So you cannot consider this line of questioning until the examining lawyer ... has that statement in their possession.

After further discussions with counsel in connection to the worker's compensation claim of the victim, the trial court instructed the jury a second time:

> [Y]esterday, there was an objection by the state that [defense counsel] was asking questions of [the victim] about a CIGNA insurance company worker's compensation claim ... and about statements that [the victim] had made to the ... company. You may recall that [the victim] stated that the ... hospital filed a claim and not him. I did not rule on the objection because the court was advised by defense counsel that this would be linked up by information that he had. I am advised today that he does not have that information and it is not available to him. The objection is sustained. In other words, I am ruling for the state. You may disregard the questions asked by defense counsel with regard to statements [the victim] made to CIGNA Insurance Company.

The defendant claims that this instruction was made in "an extremely sarcastic tone of voice" with an emphasis so as to indicate that his defense counsel was "a liar." The defendant contends that it was perfectly clear to the trial judge that defense counsel never had a copy of the statement, only information as to its content.

The defendant also refers to a violation of the rule requiring sequestration of witnesses. He contends that the victim, who had testified for the state, should not have been permitted to stay in the courtroom after his testimony. The defendant asserts that the trial judge violated the state constitution by commenting favorably upon the credibility of the victim and indicating a belief in the

6

guilt of the defendant. (See Tenn. Const., art. VI, § 9, providing that "judges shall not charge juries with respect to matters of fact, but may state and declare the law.") The defendant also argues that the trial judge's reference to Kevin Newburn as the "victim" was erroneous. He also complains that a transcript of the preliminary hearing was introduced at trial without redaction, including the opinion of the general sessions judge that there was "probable cause." He also submits that the trial court "smirked at defense counsel, would roll his eyes when [counsel] asked questions that appeared to be making headway, and generally used every type of body language possible to demean defense counsel." The defendant insists that the trial judge erroneously allowed the state's witnesses to handle the weapon used in the shooting but precluded the defense from doing so.

I

The victim filed a claim for criminal injuries compensation and the hospital where he was treated filed a claim for worker's compensation.[1] The victim admitted that he made a statement in support of his worker's compensation claim but denied having made any statement regarding his claim as a victim of a criminal act.[2] He explained that his attorney had prepared the statement regarding the claim

---

[1] In an out-of-court statement discussion, the trial judge told defense counsel that he had to show knowledge of the contents of the statement made by the victim, which was apparently never transcribed. Defense counsel could not pinpoint the source of his information. A witness from CIGNA Insurance Company, Attorney Bruce Williams of Memphis, had been subpoenaed by both the state and the defense. The state asked to excuse the insurance company representative but the court refused to do so on the basis that defense counsel had a right to call the representative as a witness. While the jury was out, the witness said there was no written form of the statement, only a tape in Richmond, Virginia. The witness claimed that he had not been subpoenaed by defense counsel and chose to appear only after consultation with the prosecution. The extent of Mr. Williams's representation was in providing advice to the insurance company as to how to respond to a faxed subpoena by the defense made the day before trial.

[2] Defense counsel received a copy of a fax from the Criminal Injuries Compensation Claims Department of the State that had been filed by the victim. In a hearing out of the presence of the jury, defense counsel read a portion of the statement:

> On February 6, 1995, Mr. Newburn and his neighbor had an argument over a refrigerator which resulted in Mr. Newburn calling the police who removed the offender from the premises. On February 7, 1995, the offender went back to Mr. Newburn's job and shot him in the face.

7

for victim compensation.  The trial court refused to allow use of the information in either claim as grounds to impeach the victim during cross-examination.

Generally speaking, the right to an effective cross-examination involves the fundamental right to a fair trial.  Yet the propriety, scope, and manner of cross-examination for the purposes of impeachment are within the discretion of the trial court.  State v. Hill, 598 S.W.2d 815, 819 (Tenn. Crim. App. 1980); Tenn. R. Evid. 611(a).

Here, the victim was questioned about the statement he had made in support of the worker's compensation claim.  He was, however, unable to remember much of the content other than it was "pretty much exactly the same thing I have already said...."  Because defense counsel did not have a copy of the statement, the trial court would not allow defense counsel to "refresh the victim's memory" by suggesting the content.

The state concedes that the trial court's assertion that "in order for the witness to be impeached on a prior inconsistent statement, the lawyer trying to do that must have in his hand the statement," is not a correct statement of the law. Tenn. R. Evid. 613.  The state argues, however, that because defense counsel's only knowledge of the statement was through discussions with clerical employees of the insurance agency, the trial court properly precluded any reference to the statement.

---

The victim denied making the statement and the trial court ruled that the defendant was "stuck with the answer" and could not introduce the faxed statement.

8

As to the criminal injuries claim, the victim recognized only the first and last pages of the document, denied having ever read an attached police report, and contended that he did not make the statement defense counsel sought to use for impeachment. The trial court ruled that it would have been admissible only if counsel could qualify the extrinsic evidence. The primary aim of the cross-examination was to attack the credibility of the victim by showing that the victim had made a false claim of ownership of the refrigerator. A second objective was to call into question whether the victim had contacted police about the dispute.

The victim could not recall the details of the his injury claim. When defense counsel tried to refresh his memory, despite having only a general idea based on conversations with another as to the content of the document, the purpose of the cross-examination was frustrated regardless of the intervention by the trial court. While the subject matter was clearly collateral to the central issue, it had some relevance to the credibility of the victim. In context of the entire record, however, it is our view that the error was harmless; while defense counsel may have had some basis to consider his colloquy with the court as a personal affront, it is our opinion that the ruling had no effect on the results of the trial. Tenn. R. App. P. 36(b); Wilson v. State, 109 Tenn. 167, 70 S.W.2d 57 (1902).

II

Rule 615, Tenn. R. Evid., provides that witnesses, upon request of either counsel, must be excluded from the courtroom except during their testimony and prevented from disclosing the content of their proof. Here, the victim was called as a witness for the state. Because defense counsel indicated that he might recall the victim during defense proof, the trial court declined to honor counsel's request for continued sequestration. The state concedes that the trial court committed error

9

by failing to recognize that the rule of sequestration includes rebuttal witnesses. Yet the state argues that any error in the failure to exclude the victim as a witness was harmless. Tenn. R. App. P. 36(b).

A history of the rule of sequestration of witnesses appears in State v. Anthony, 836 S.W.2d 600 (Tenn. Crim. App. 1992). Traditionally, trial judges have been afforded wide discretion in determining whether to impose the sanctions of excluding the evidence of the witness suspected of violating "the rule" or declaring a mistrial. State v. Moffett, 729 S.W.2d 679, 681 (Tenn. Crim. App. 1986); Tennessee Law of Evidence, Neil P. Cohen, et al., § 615.4 (3d ed. 1995).

"The rule" was included in the Tennessee Rules of Evidence:

At the request of a party the court shall order witnesses, including rebuttal witnesses, excluded at trial or other adjudicatory hearing. Sequestration shall be effective before voir dire or opening statements if requested. The court shall order all persons not to disclose by any means to excluded witnesses any live trial testimony or exhibits created in the courtroom by a witness. This rule does not authorize exclusion of (1) a party who is a natural person, or (2) an officer or employee of a party which is not a natural person designated as its representative by its attorney, or (3) a person whose presence is shown by a party to be essential to the presentation of the party's cause.

Tenn. R. Evid. 615. Prior to January 1, 1990, the effective date of the Rules of Evidence, "the rule" did not apply to rebuttal witnesses. Rule 615, however, provides that upon request, "the court shall order witnesses, including rebuttal witnesses, excluded at trial or other adjudicatory hearing...." The new rule does vest trial courts with some discretion in that it does not apply to "a person whose presence is shown by a party to be essential...." Tenn. R. Evid. 615. The Advisory Commission Comment to this rule provides as follows:

If a witness inadvertently and unintentionally hears some trial testimony, the sense of the rule would permit the

10

> judge to allow the witness to testify if fair under the circumstances.

In this case, the victim, after testifying for the state and retained by the defense as a possible witness, was never recalled to the stand. Neither was he recalled to testify again for the state. Under these circumstances, it cannot be said that the state gained any advantage by the violation. Thus, any error was clearly harmless. State v. George Corbit Wallace, Jr., No. 01C01-9106-CC-00189 (Tenn. Crim. App., at Nashville, Feb. 20, 1992).

III

The defendant asserts that the trial judge made an improper comment on the evidence by referring to Newburn as a "victim," by permitting the general sessions transcript into evidence, by prohibiting the defendant from handling the weapon during his testimony, and by making sarcastic remarks and exhibiting unfavorable body language.

As to the reference to Newburn as victim, the trial court provided a curative instruction as suggested by the defense. Because the trial court instructed the jury to disregard his use of the word "victim" because it was in no way intended to express an opinion that Newburn was, in fact, a victim, the error was cured. It is presumed that a jury will follow the instructions of the court in such a situation. State v. Johnson, 762 S.W.2d 110, 116 (Tenn. 1988).

On at least two separate occasions during the course of the trial, defense counsel agreed to allow the entire general sessions court transcript to be read to the jury. Thus, the defense failed to take steps to prevent any alleged error by the admission of the transcript. Tenn. R. App. P. 36(a). Moreover, the trial court correctly instructed the jury on the presumption of innocence and properly charged

11

that the burden of proof was on the state beyond a reasonable doubt.  It is unlikely, under these circumstances, that any probable cause determination at the general sessions court level (a process repeated by the grand jury indictment) would have prejudiced the jury.

It is difficult to assess allegations regarding body language and sarcasm.  The written record rarely provides an accurate reflection of any such behavior.  That is the case here as well.  A reference to the trial judge's laughter after one exchange was, in our view, clearly inconsequential in the entire context of the trial.  Tenn. R. App. P. 36(b).  During the course of the trial, the trial court instructed the jury to determine the facts from the testimony of the witnesses.  The law presumes that the jury adhered to those instructions.

Finally, the only witness who was permitted to handle the weapon had been qualified as an expert on "how nine millimeter weapons eject spent shells." Witnesses other than the court officer, whether called by the state or defense, were not allowed to do so.  In answer to the question by defense counsel for permission to "approach the witness and pass him the weapon," the trial court answered, "The deputy can show it to him, that's his job."  When defense counsel complained that the state's attorney had been allowed to handle the weapon, the trial court responded, "You're welcome to ... but I cannot let you ... hand that weapon to this witness...."[3]  The rule of the trial court precluding the actual handling of weapons by witnesses other than experts is reasonable.  Because the rule applied to both the state and the defense, the incident did not, in our view, affect the results of the trial.

---

[3]This exchange appears to have taken place in a bench conference although the record is not clear on that point.

12

Accordingly, the judgment is affirmed.

_____
Gary R. Wade, Judge

CONCUR:


_____
John H. Peay, Judge


_____
Thomas T. Woodall, Judge