**STATE of Tennessee**

v.

**Edwardo RODRIGUEZ.**

Supreme Court of Tennessee,
at Nashville.

Oct. 3, 2007 Session.

April 24, 2008.

William K. Cather, Assistant District Public Defender, Lebanon, Tennessee, for the appellant, Edwardo Rodriguez.

Robert E. Cooper, Jr., Attorney General and Reporter; Michael E. Moore, Solicitor General; Rachel E. Willis, Assistant Attorney General; and Robert N. Hibbett, As-sistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

WILLIAM C. KOCH, JR., J., delivered the opinion of the court, in which WILLIAM M. BARKER, C.J., JANICE M. HOLDER, CORNELIA A. CLARK, and GARY R. WADE, JJ., joined.

This appeal calls into question the verdict of a Wilson County jury finding the defendant guilty of two counts of child rape and aggravated sexual battery. After receiving two consecutive twenty-year sentences, the defendant appealed to the Court of Criminal Appeals. He asserted that the trial court erred by admitting evidence suggesting that he possessed child pornography and that the trial court also erred by denying his requests for a mistrial after two of the State's witnesses referred to other uncharged allegations of sexual abuse. The Court of Criminal Appeals determined that the trial court did not err by declining to declare a mistrial but also determined that the trial court erred by admitting evidence regarding the defendant's possession of child pornography. However, the court decided that the admission of the evidence regarding the defendant's possession of child pornography was harmless error. We granted the defendant's application for permission to appeal. We concur with the Court of Criminal Appeals' conclusion that the trial court erred by admitting the evidence regarding the defendant's possession of child pornography. However, we have determined that the admission of the evidence regarding the defendant's possession of child pornography was not harmless. Therefore, we reverse the defendant's conviction and remand the case for a new trial.

I.

W.W.[1] owns a house in Wilson County. In 1996, she shared her home with her daughter, T.R., and her son-in-law, Edwardo Rodriguez. Three of T.R.'s children from prior relationships, C.Y., C.S., and C.R.,[2] also lived in the house. Another grandson, J.Y.,[3] spent approximately two weekends each month in W.W.'s home.

All the adults in the home were employed. In 1998, W.W. and T.R. were often required to work on Saturday. Mr. Rodriguez also worked on Saturday when the weather permitted, but on those Saturdays when he was not working, Mr. Rodriguez was responsible for supervising the three children living in the house, as well as J.Y. when he was visiting. On weekends when C.Y. and C.S. were visiting their fathers, Mr. Rodriguez was responsible for supervising only C.R. and J.Y.

Mr. Rodriguez moved out of W.W.'s house and began living with another woman in June 2001. He and T.R. reconciled approximately six months later, and in early 2002, he moved back into W.W.'s house with T.R. and her children. Shortly thereafter, the Tennessee Department of Children's Services and the local law enforcement authorities received information that C.R. and J.Y., then both nine years old, had reported that Mr. Rodriguez had sexually molested them sometime in 1998. As a result of these allegations, a Wilson County grand jury indicted Mr. Rodriguez on two counts of rape of a child and two counts of aggravated sexual battery based on conduct occurring on an unspecified date in 1998.

It became evident prior to trial that the State intended to bolster its case against Mr. Rodriguez by introducing evidence purporting to prove that Mr. Rodriguez possessed pornographic images, including pornographic images of children, which he had obtained from the Internet using a computer in the living room of W.W.'s house. Prior to trial, Mr. Rodriguez filed a motion to exclude this evidence, arguing among other things that the "evidence is obviously intended to show a propensity or bad character tendency" in violation of Tenn. R. Evid. 404(b).

The trial court conducted a jury-out hearing at the beginning of the trial to address Mr. Rodriguez's objection to the pornographic images, particularly the images allegedly involving children. The assistant district attorney asserted that the evidence regarding the pornographic computer images was admissible because "it goes to motive and intent to show that he [Mr. Rodriguez] has a thing for children." However, the prosecutor also conceded that the authorities had failed to recover any pornographic images either from the computer itself or from any of the disks found in W.W.'s home.

The prosecutor also informed the court that he intended to call one of W.W.'s other adult children to testify that he saw the pornographic images on a computer disk sometime after January 2002 before they were erased. The prosecutor also stated that he intended to present the testimony of a computer specialist employed by the Tennessee Bureau of Investigation ("TBI") who examined the computer after it was taken from W.W.'s home. This witness was prepared to testify that even though he had not found pornographic images on the computer, he had found a number of empty files with

---

1. It is our policy to refer to victims by their initials in child sex offense cases. In this case we have decided to protect the identities of the victims even further by referring to all parties, except the defendant, by their initials.

2. C.R. was born on April 26, 1991.

3. J.Y. was born on December 9, 1990.

suggestive file names that were consistent with pornographic images. The trial court decided to withhold ruling on Mr. Rodriguez's objection until it had an opportunity to hear the TBI expert's testimony outside of the jury's presence.

Both C.R. and J.Y. testified during the State's case-in-chief. J.Y. stated that the sexual acts by Mr. Rodriguez occurred on one Saturday in 1998 after Mr. Rodriguez invited the boys into his bedroom where he showed them pornography on television. According to J.Y., Mr. Rodriguez performed oral sex on the boys and then had the boys perform oral sex on him after they watched the pornography on television. Over objections from Mr. Rodriguez, the State also presented the testimony of W.W. and C.S. regarding Mr. Rodriguez's use of the computer including that he would be on the Internet late at night.

Following the testimony of C.R. and J.Y., the prosecutor informed the trial court that he intended to call the boys' uncle, T.Y., to testify about the images he found on W.W.'s computer after Mr. Rodriguez moved out in January 2002. The trial court, confusing the pornographic video that J.Y. testified he had seen in Mr. Rodriguez's bedroom with the pornographic images on the computer in the living room, decided to permit T.Y. to testify.[4] The trial court reasoned:

> It's admissible because one of the children said that the defendant took that child in and showed him videos of adults having sex. This is in corroboration to what the child said. So it's admissible for that purpose. It's corroborative evidence that this did occur, it's part of the act. . . . Absolutely. A computer and porn video like you play on the television are all one and the same now days. You

can show them either way. You can show something on a video on a computer the same way you can television. You have a screen.

In response to defense counsel's efforts to point out the difference between the television in the bedroom and the computer monitor in the living room, the trial court stated, "[t]he children were cross examined and their credibility is at issue and this is corroboration possibly of what their story was, what they told."

Thereafter, in the jury's presence, T.Y. testified that he found pornographic images on a floppy computer disk in W.W.'s house after Mr. Rodriguez moved out. He described these images as adults engaging in sexual intercourse and images of naked children. He estimated that the children were between ten and thirteen years of age and added that the children were not engaging in any sexual acts in the pictures he saw. T.Y. also testified that he erased all the images at W.W.'s request and that he had continued to use the disks after he erased them.

Following T.Y.'s testimony, the State called a detective employed by the Wilson County Sheriff who testified that he removed the computer from W.W.'s living room and that he had delivered the computer to the TBI for testing. He also testified that he did not remove any disks from W.W.'s house. The purpose of this testimony was to provide a foundation for the testimony of the TBI computer specialist who examined the computer. However, following a jury-out hearing, the trial court excluded the testimony of the computer specialist. The prosecution quickly rested its case after the trial court excluded the computer specialist's testimony.

---

**4.** The record contains no evidence that there was a second computer in Mr. Rodriguez's bedroom or that Mr. Rodriguez ever showed the boys pornography on the computer in the living room.

Mr. Rodriguez took the stand and categorically denied that he had engaged in any illegal sexual conduct with C.R. and J.Y. He presented no other evidence. After deliberating for two hours, the jury found Mr. Rodriguez guilty on all four counts. The trial court merged the two aggravated sexual battery convictions into the two child rape convictions. Following a later sentencing hearing, the trial court sentenced Mr. Rodriguez to twenty years on each count of child rape and ordered that he serve the sentences consecutively.

Mr. Rodriguez appealed to the Tennessee Court of Criminal Appeals. He argued (1) that the trial court erred by failing to grant a mistrial on two occasions during the trial when witnesses mentioned other uncharged incidents of sexual abuse, (2) that the trial court erred by admitting the evidence regarding his possession of child pornography, and (3) that the trial court erred by imposing consecutive sentences. On February 22, 2007, the Court of Criminal Appeals filed an opinion affirming Mr. Rodriguez's conviction but modifying his sentences to be served concurrently rather than consecutively. *State v. Rodriguez,* No. M2005–02466–CCA–R3–CD, 2007 WL 551245, at *9 (Tenn.Crim.App. Feb.22, 2007). The court also concluded that the trial court did not err by denying Mr. Rodriguez's requests for a mistrial. *State v. Rodriguez,* 2007 WL 551245, at *7. Finally, the court concluded that the admission of the evidence regarding the pornographic images on the computer was error but that "the error in admitting evidence regarding the defendant's viewing of computer pornography qualifies as harmless because there was more than sufficient proof of the defendant's guilt." *State v. Rodriguez,* 2007 WL 551245, at *6.

Mr. Rodriguez filed a Tenn. R.App. P. 11 application for permission to appeal with this Court that raises two issues. First, he asserts that the Court of Criminal Appeals erred by failing to hold that the trial court abused its discretion by denying his two motions for a mistrial based on the references of prosecution witnesses to other uncharged acts of child sexual abuse. Second, he asserts that the Court of Criminal Appeals erred by concluding that the erroneous admission of the evidence regarding the existence of child pornography on the computer was harmless error.

## II.

The harmless error doctrine has been an integral part of Tennessee's jurisprudence for almost two hundred years. It recognizes that the central purpose of a criminal trial is to decide the factual question of the defendant's guilt or innocence, and it promotes the public's respect for the criminal process by focusing on the underlying fairness of the trial itself rather than on technicalities or on the virtually inevitable presence of immaterial error. *Delaware v. Van Arsdall,* 475 U.S. 673, 681, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986); *State v. Howell,* 868 S.W.2d 238, 253 (Tenn.1993). To ensure that the doctrine remains viable, the courts must keep it carefully calibrated lest it mistakenly magnify technicalities into material errors or denigrate the effect of material errors simply because of the perceived guilt of the defendant.[5] This case provides an opportunity to calibrate the harmless error doctrine with regard to

---

5. Justice Joe R. Greenhill, who served as Chief Justice of the Texas Supreme Court for ten years, once characterized the harmless error doctrine as follows: "The judge sure goofed up the trial, but we think that the defendant is guilty anyway, so what the hell." Albert W. Alschuler, *Courtroom Misconduct by Prosecutors and Trial Judges,* 50 Tex. L.Rev. 629, 658–59 (1972).

decisions involving the admissibility of evidence.

### A.

The Tennessee Constitution of 1796 did not establish a separate, independent judicial branch of government or a court that exercised exclusive appellate jurisdiction. Tennessee's judicial business was conducted by superior court judges who exercised both original and appellate jurisdiction. This arrangement soon proved unworkable, and in 1809 Senator Thomas Hart Benton introduced and passed legislation to reorganize Tennessee's courts.[6] This legislation, which took effect on January 1, 1810, replaced the superior courts with new trial courts called circuit courts and also created a three-member Supreme Court of Errors and Appeals. In the original legislation, the Supreme Court of Errors and Appeals exercised only appellate jurisdiction.

In the same legislative session, the Tennessee General Assembly enacted another bill sponsored by Senator Benton relating to the work of the Supreme Court of Errors and Appeals. Among other things, this bill provided that

no judgment, decision or decree of the circuit courts shall be reversed in the supreme court, unless for errors which affect the merits of the judgment, decision or decree complained of.

Act of Nov. 23, 1809, ch. 126, § 10, 1809 Tenn. Pub. Acts 255, 257.[7] While the reasons for enacting the 1809 harmless error statute have been lost with the passage of time, the General Assembly may have, at least in part, been motivated by a concern that the courts were basing their decisions on legal technicalities.[8]

The 1809 harmless error statute was entirely consistent with the then-prevailing orthodox English rule used by appellate courts to review evidentiary issues in both civil and criminal cases. The orthodox English rule was that the "erroneous admission or rejection of a piece of evidence was not a sufficient ground for setting aside the verdict and ordering a new trial unless upon all the evidence it appeared to the judges that the truth had thereby not been reached." I John H. Wigmore, *Evidence* § 21, at 884 (Tillers rev. 1983) ("Wigmore").[9]

In 1835, the Court of Exchequer expressed concern that the "frequent appli-

---

6. Act of Nov. 16, 1809, ch. 49, 1809 Tenn. Pub. Acts 116; *see also* Theodore Brown, Jr., *The Formative Period in the History of the Supreme Court of Tennessee, 1796–1835, in A History of the Tennessee Supreme Court* 7–8, 374 n. 13 (James W. Ely, Jr. ed., 2002).

7. The 1809 harmless error statute was most recently codified at Tenn.Code Ann. § 27–1–116 (1980). It was repealed in 1981. *See* Act of May 20, 1981, ch. 449, § 1(8), 1981 Tenn. Pub. Acts 667, 668.

8. For example, in 1808, the superior court had sustained a demurrer to an indictment for larceny of one dollar because the indictment failed to state whether the charge was based on the statutory definition of petit larceny or the common-law definition of petit larceny. *State v. Humphreys*, 1 Tenn. (1 Overt.) 307, 308 (1808). In a later, unrelated deci-

sion, this Court criticized one of its earlier decisions because it was "made at a time when technical objections operating as a shield for crime were more indulged in than they are at the present day." *Hale v. State*, 41 Tenn. (1 Cold.) 167, 168 (1860).

9. For example, in *Doe v. Tyler*, 6 Bing 561, 563–64, 130 Eng. Rep. 1397, 1398 (C.P.1830), the court held that it would weigh the evidence independently and ignore an error with regard to the admission of evidence as long as the untainted evidence supported the jury's finding. *See also* Craig Goldblatt, *Harmless Error as Constitutional Common Law: Congress's Power to Reverse Arizona v. Fulminante*, 60 U. Chi. L.Rev. 985, 993–94 (1993) ("Goldblatt").

cation" of the orthodox English rule "would cause the rules of evidence to be less carefully considered." *Crease v. Barrett*, 1 Cr. M. & R. 919, 933, 149 Eng. Rep. 1353, 1359, 1835 WL 3156 (Ex. 1835). This decision, or perhaps subsequent erroneous interpretations of this decision,[10] resulted in the replacement of the orthodox English rule with the so-called Exchequer rule. Under the Exchequer rule, a trial error with regard to the ·admission or rejection of evidence, even the most insignificant items of evidence, gave rise to a presumption of prejudice and almost automatically required a new trial. 7 Wayne R. LaFave, Jerold H. Israel, Nancy J. King & Orin S. Keller, *Criminal Procedure* § 27.6(a), at 100 (3d ed.2007); Traynor, at 6–10; Wigmore § 21, at 887.

The Exchequer rule was speedily embraced by all English courts. By the mid–1800s, it was firmly entrenched in England, and virtually all trial error was viewed as per se reversible. William T. Pizzi & Morris B. Hoffman, *Jury Selection Errors on Appeal*, 38 Am.Crim. L.Rev. 1391, 1419 & n. 146 (2001) ("Pizzi & Hoffman"); Wigmore § 21, at 887–88. Eventually, it became widely believed in England that the Exchequer rule had tipped the balance too far away from the orthodox English rule. Goldblatt, 60 U. Chi. L.Rev. at 994. The backlog and delay resulting from the frequent and multiple retrials caused by the application of the Exchequer rule resulted in its demise in England with the enactment of the Judicature Act of 1873 and the promulgation in 1883 of the Rules of the Supreme Court of Judicature. Traynor, at 8–9; Wigmore § 21, at 888.

Before its demise in England, the Exchequer rule found its way to the United States. Its roots sunk deep into the American common law. By the late nineteenth century, most federal and state appellate courts believed that virtually all trial errors, no matter how trivial, required reversal and a new trial. Traynor, at 14; Wigmore § 21, at 888; Charles J. Ogletree, Jr., *Arizona v. Fulminante: The Harm of Applying Harmless Error to Coerced Confessions*, 105 Harv. L.Rev. 152, 156 (1991); Pizzi & Hoffman, 38 Am. Crim. L.Rev. at 1419–20. Thus, the Exchequer rule had transformed trials in American courts into "mere game[s]"[11] whose purpose was to sow reversible error into the record. *Kotteakos v. United States*, 328 U.S. 750, 759, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946). With many cases being tried more than once, the backlogs and delays that had plagued the English courts became commonplace in American courts. Steven H. Goldberg, *Harmless Error: Constitutional Sneak Thief*, 71 J.Crim. L. & Criminology 421, 422 (1980) ("Goldberg"). By the turn of the century, American courts were viewed as "impregnable citadels of technicality." Marcus A. Kavanagh, *Improvement of Administration of Criminal Justice By Exercise of Judicial Power*, 11 A.B.A. J. 217, 222 (1925).

By the early part of the twentieth century, a reform movement comprised of lawyers and judges called for the abandonment of the Exchequer rule in American courts.[12] Their purpose was "to prevent

---

10. Roger J. Traynor, *The Riddle of Harmless Error* 4–7 (1970) ("Traynor").

11. Roscoe Pound, *The Causes of Popular Dissatisfaction with the Administration of Justice*, 40 Am. L.Rev. 729 (1906), *reprinted in* 48 S. Tex. L.Rev. 853, 861–62 (2007).

12. Among the leaders of this movement were Felix Frankfurter, Roscoe Pound, William Howard Taft, and John H. Wigmore. *Kotteakos v. United States*, 328 U.S. at 759 n. 14, 66 S.Ct. 1239; Traynor, at 12–17; Goldberg, 71 J.Crim. L. & Criminology at 422 n. 15. Characterizing the Exchequer rule as "lamenta-

matters concerned with the mere etiquette of trials and with the formalities and minutiae of procedure from touching the merits of a verdict." *Bruno v. United States*, 308 U.S. 287, 294, 60 S.Ct. 198, 84 L.Ed. 257 (1939). The efforts of these reformers produced results. By 1927, eighteen states and Congress had enacted legislation and ten more states had established some sort of harmless error doctrine by judicial decision. *Kotteakos v. United States*, 328 U.S. at 759 n. 12, 66 S.Ct. 1239; Edson R. Sunderland, *The Problem of Appellate Review*, 5 Tex. L.Rev. 126, 147 (1926). By 1967, the United States Supreme Court noted that all fifty states and the federal government had harmless error statutes or rules. *Chapman v. California*, 386 U.S. 18, 22, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

Tennessee was not among the American jurisdictions that embraced the Exchequer rule. In 1853, this Court noted that "[t]he day has now passed for rescuing the guilty upon mere technicalities. The Legislature has wisely willed it, and it is not for the courts to resist the great reform. We would favor rather than obstruct it." *Isham v. State*, 33 Tenn. (1 Sneed) 111, 115 (1853). Seven years later, we observed that "[t]he inclination now, both of the Legislature and the courts, is, not to screen the guilty by artificial and unmeaning rules and distinctions, but to see that the law is enforced against the guilty." *Hale v. State*, 41 Tenn. (1 Cold.) at 168. Almost twenty years later, the Court again stated that "[t]he day for escaping the consequences of crime on mere technicalities, not going to the protection of essen-

tial right, has gone by, and violators of law had as well accept the fact and act accordingly." *State v. Staley*, 71 Tenn. 565, 567 (1879). At the turn of the century, this Court summarized its application of the 1809 harmless error statute as follows:

The processes of the court and the manner and mode of the trial are intended to develop the main question of the guilt or innocence of the defendant, and when the guilt appears plainly, unequivocally, and beyond all doubt, this court will not reverse, unless grave errors have been committed, which would change the record, and show the defendant either not guilty, or put his guilt in doubt. While it is the desire of this court that no innocent men shall suffer for want of a fair trial, it is the duty of the court at the same time to see that no guilty one shall escape through a mere irregularity or technicality that does not and can not affect the merits, which in every criminal case is the guilt or innocence of the accused.

*Wilson v. State*, 109 Tenn. 167, 178, 70 S.W. 57, 60 (1902).

In 1911, despite this Court's repeated rejection of the Exchequer rule in favor of the 1809 harmless error statute, the General Assembly joined the growing number of states that had enacted new harmless error statutes. While leaving the 1809 harmless error statute in place, the General Assembly's new statute provided that

no verdict or judgment shall be set aside or new trial granted by any of the Appellate Courts of this State, in any civil or criminal cause, on the ground of error

---

ble," Professor Wigmore noted that it had "foster[ed] the spirit of litigous gambling." John H. Wigmore, *New Trials for Erroneous Rulings Upon Evidence; A Practical Problem for American Justice*, 3 Colum. L.Rev. 433, 439 (1903) (*"New Trials for Erroneous Rulings Upon Evidence"*). Professor Wigmore also

stated that the "exaltation of technicalities of every sort merely because they are raised on behalf of an accused person" was "reprehensible" and observed that "the maudlin sentimentality of judges in criminal cases must cease." *New Trials for Erroneous Rulings Upon Evidence*, 3 Colum. L.Rev. at 444.

in the charge of the Judge to the jury, or on account of the improper admission or rejection of evidence, or for error in acting on any pleading, demurrer, or indictment, or for any error in any procedure in the cause, unless, in the opinion of the Appellate Court to which application is made, after an examination of the entire record in the cause, it shall affirmatively appear that the error complained of has effected the results of the trial.

Act of Apr. 6, 1911, ch. 32, 1911 Tenn. Pub. Acts 66.[13]

In 1976, this Court received and approved a set of rules of criminal procedure drafted by the Advisory Commission on Criminal Rules. The General Assembly declined to approve these rules in 1976 and 1977 but approved them during its 1978 session. They became effective on July 13, 1978. These rules contained a harmless error rule that tracked the language of the 1911 harmless error statute. Thus, Tenn. R.Crim. P. 52(a) provides that "[n]o conviction shall be reversed on appeal except for errors that affirmatively appear to have affected the result of the trial on the merits."

While the Tennessee Rules of Criminal Procedure were being considered by the General Assembly, a separate advisory commission drafted and presented to the Court a proposed set of rules of appellate procedure. These rules, which apply to all proceedings before Tennessee's appellate courts,[14] also contained a harmless error rule. They were approved by the General Assembly and became effective on July 1, 1979. Thus, Tenn. R.App. P. 36(b) states that "[a] final judgment from which relief is available and otherwise appropriate shall not be set aside unless, considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process."

As of July 1, 1979, Tennessee had four separate sources for the harmless error doctrine—Tenn. Code Ann. § 27–1–116 (the 1809 harmless error statute), Tenn. Code Ann. § 27–1–117 (the 1911 harmless error statute), Tenn. R.Crim. P. 52(a), and Tenn. R.App. P. 36(b). Recognizing the potential for confusion, the Tennessee Code Commission included compiler's notes in the annotations to Tenn.Code Ann. §§ 27–1–116, –117 warning that these statutes may be "affected" by Tenn. R.Crim. P. 52(a) and may be "superseded" by Tenn. R.App. P. 36(a). In 1981, the General Assembly lessened the risk of confusion by repealing Tenn.Code Ann. §§ 27–1–116, –117. *See* Act of May 20, 1981, ch. 449, § 1(8), 1981 Tenn. Pub. Acts 667, 668. Thus, for the past twenty-seven years, both Tenn. R.Crim. P. 52(a) and Tenn. R.App. P. 36(b) have been viewed as providing the foundation for Tennessee's harmless error doctrine.

One might question the need for two harmless error rules. After all, the harmless error doctrine should operate the same way in criminal proceedings that it does in civil proceedings and in trial courts the same way it operates in appellate courts.[15] Furthermore, the differences in

---

13. The 1911 harmless error statute was most recently codified at Tenn.Code Ann. § 27–1–117 (1980). It was repealed in 1981. *See* Act of May 20, 1981, ch. 449, § 1(8), 1981 Tenn. Pub. Acts 667, 668.

14. Tenn. R.App. P. 1.

15. It is not uncommon for trial courts to employ a harmless error analysis in proceedings for post-conviction relief and other proceedings. *See, e.g., State v. Boyd,* 959 S.W.2d 557, 558 (Tenn.1998) (noting that the trial court had employed a harmless error analysis in a proceeding seeking post-conviction relief).

the rules' language could possibly lead to inconsistent interpretations. However, as a practical matter, Tennessee's courts have not interpreted Tenn. R.App. P. 36(b) and Tenn. R.Crim. P. 52(a) differently, and it is now commonplace for the courts to cite both rules together. *See, e.g., State v. Copeland,* 226 S.W.3d 287, 302–03 (Tenn. 2007); *State v. Denton,* 149 S.W.3d 1, 15 (Tenn.2004); *State v. Toliver,* 117 S.W.3d 216, 231 (Tenn.2004). For the purpose of this opinion, we have chosen to base our analysis on Tenn. R.App. P. 36(b).

### B.

■ All errors are not the same, nor do they have the same effect on the judicial process in general or on a particular trial. Accordingly, for the purpose of the harmless error analysis, this Court has recognized three categories of error—structural constitutional error, non-structural constitutional error, and non-constitutional error. *State v. Powers,* 101 S.W.3d 383, 397 (Tenn.2003); *State v. Garrison,* 40 S.W.3d 426, 433–34 (Tenn.2000); *State v. Harris,* 989 S.W.2d 307, 314–15 (Tenn.1999). The distinctions between these categories of error are more than academic because they define the standards that the appellate courts use to determine whether each category of error can be harmless.

■ Structural constitutional errors are errors that compromise the integrity of the judicial process itself. *State v. Garrison,* 40 S.W.3d at 433 n. 9. They involve defects in the trial mechanism. *Cottingham v. Cottingham,* 193 S.W.3d 531, 537 (Tenn.2006). These errors "deprive defendants of 'basic protections' without which 'a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence ... and no [such] criminal punishment may be regarded as funda-

mentally fair.' " *Momon v. State,* 18 S.W.3d 152, 165 (Tenn.1999) (quoting *Neder v. United States,* 527 U.S. 1, 8–9, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999)). Examples of structural constitutional errors include the complete denial of the right to counsel, racial discrimination in the selection of a grand jury, denial of the right of self-representation at trial, and denial of the right to a trial by jury. *Momon v. State,* 18 S.W.3d at 165–66. Structural constitutional errors are not amenable to harmless error review, and therefore, they require automatic reversal when they occur. *Cottingham v. Cottingham,* 193 S.W.3d at 537; *State v. Scott,* 33 S.W.3d 746, 755 n. 6 (Tenn.2000).

■ On the other hand, non-structural constitutional errors [16] do not require automatic reversal and are, therefore, subject to a harmless error analysis. *State v. Allen,* 69 S.W.3d 181, 190 (Tenn.2002). However, the burden on the State to demonstrate that a non-structural constitutional error is harmless remains quite stringent. The existence of a non-structural constitutional error requires reversal unless the State demonstrates beyond a reasonable doubt that the error is harmless. *State v. Rice,* 184 S.W.3d 646, 670 (Tenn. 2006); *State v. Powers,* 101 S.W.3d at 397. The test used to determine whether a non-structural constitutional error is harmless is "whether it appears 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.' " *State v. Allen,* 69 S.W.3d at 190 (quoting *Neder v. U.S.,* 527 U.S. at 15, 119 S.Ct. 1827); *see also State v. Riels,* 216 S.W.3d 737, 747 (Tenn.2007); *State v. Harris,* 989 S.W.2d at 315.

■ The harmlessness of non-constitutional errors is analyzed using the

---

**16.** This Court has held that the omission of a lesser included offense instruction was a non-structural constitutional error. *State v. Page,* 184 S.W.3d 223, 230 (Tenn.2006).

framework provided by Tenn. R.App. P. 36(b). Where an error is not of a constitutional variety, Tennessee law places the burden on the defendant who is seeking to invalidate his or her conviction to demonstrate that the error "more probably than not affected the judgment or would result in prejudice to the judicial process." Tenn. R.App. P. 36(b); *State v. Ely*, 48 S.W.3d 710, 725 (Tenn.2001); *State v. Harris*, 989 S.W.2d at 315. When the appellate courts are assessing the impact of a non-constitutional error, Tenn. R.App. P. 36(b) requires them to consider the whole record. Thus, the courts may appropriately consider the properly admitted evidence of the defendant's guilt. *State v. Gilliland*, 22 S.W.3d 266, 274 (Tenn.2000). The greater the amount of evidence of guilt, the heavier the burden on the defendant to demonstrate that a non-constitutional error involving a substantial right more probably than not affected the outcome of the trial. *State v. Toliver*, 117 S.W.3d 216, 231 (Tenn.2003); *State v. Francis*, 669 S.W.2d 85, 91 (Tenn.1984).[17]

 When an appellate court undertakes a harmless error analysis its purpose is to ascertain the actual basis for the jury's verdict. *State v. Mallard*, 40 S.W.3d 473, 489 (Tenn.2001); *Momon v. State*, 18 S.W.3d at 168. An inquiry into harmless error does not turn upon the existence of sufficient evidence to affirm a conviction or even a belief that the jury's verdict is correct. *See, e.g., State v. Toliver*, 117 S.W.3d at 231; *State v. Allen*, 69 S.W.3d at 191; *see also Kotteakos v. United States*, 328 U.S. at 764–65, 66 S.Ct. 1239. To the contrary, the crucial consideration is what impact the error may reasonably be taken to have had on the jury's decision-making. *See e.g., Kotteakos v. United States*, 328 U.S. at 764, 66 S.Ct. 1239; *State v. Denton*, 149 S.W.3d at 16–17; *State v. Dooley*, 29 S.W.3d 542, 555 (Tenn.Crim.App.2000). Where an error more probably than not had a substantial and injurious impact on the jury's decision-making, it is not harmless. *Kotteakos v. United States*, 328 U.S. at 776, 66 S.Ct. 1239.[18]

### C.

While the appellate review based on the harmless error approach in Tenn. R.App. P. 36(b) is vastly superior to the Exchequer rule, it is not without potential pitfalls of its own. Accordingly, Tennessee courts must be careful in their application of the harmless error doctrine. Ill-considered applications of the doctrine have the potential to blur the distinction between being believed to be guilty-in-fact and being found guilty in accordance with principles of law that are thought to frame a fair trial.[19] The rules of evidence were not designed in a vacuum.[20] To the contrary, "[e]ach rule, by balancing probative value,

---

17. The consideration of the untainted evidence of guilt cannot become the tail that wags the dog. This Court has never held that the existence of sufficient evidence of guilt to convict a defendant trumps any non-constitutional error.

18. *Tavares v. State*, 117 Nev. 725, 30 P.3d 1128, 1132 (2001); *Morales v. State*, 32 S.W.3d 862, 867 (Tex.Crim.App.2000). As noted by Justice Traynor, "[i]t was not rational in the age of technicality for the appellate courts to declare essentially harmless errors fatal. It would not be rational now, even in a so-called age of permissiveness, to declare essentially prejudicial errors harmless." Traynor, at 80.

19. *See* Charles S. Chapel, *The Irony of Harmless Error*, 51 Okla. L.Rev. 501, 509–14 (1998); Donald A. Winslow, Note, *Harmful Use of Harmless Error in Criminal Cases*, 64 Cornell L.Rev. 538, 541 (1979) ("Winslow").

20. Stephen A. Saltzburg, *The Harm of Harmless Error*, 59 Va. L.Rev. 988, 989 (1973) ("Saltzburg").

by excluding unreliable evidence, by barring extraneous matter, and by guiding the judge and jury in the proper performance of their decision-making function, is intended to play a role in guaranteeing a fair trial."[21] Each rule of evidence "reflects the policy of the state with respect to fairness regardless of the identity of the defendant."[22] A harmless error rule that is too lenient in nature risks denigrating the policies and interests that underlie non-constitutional rules of evidence in structuring a fair trial. *Commonwealth v. Story*, 476 Pa. 391, 383 A.2d 155, 163–64 & n. 15 (1978).

This result follows because when the rules of evidence and procedure stand unenforced through a finding of harmless error, there is no deterrence that would encourage future adherence to the rule.[23] The absence of deterrence may "tacitly inform[ ] prosecutors that they can weigh the commission of evidentiary or procedural violations ... against an increasingly accurate prediction that the appellate courts will ignore the misconduct when sufficient evidence exists to prove the defendant's guilt."[24] Ultimately, a lenient harmless error analysis "encourages a prosecutorial team to trifle with a defendant's rights and is no more desirable than one which would reverse for trivial errors."[25] Simply stated, "[e]very time an error is declared harmless in a particular situation, it diminishes the risk to the prosecutor in the use of the evidence or the technique."[26] Thus, holding errors to be harmless may have the effect over time of extending the limits of the law, thereby effectively modifying the law itself.[27]

Tennessee's harmless error doctrine, reflected in Tenn. R.App. P. 36(b), rests on a foundation that recognizes that a person accused of a crime is entitled to an essentially fair trial and that a person convicted of a crime as a result of an essentially fair trial is not entitled to have his or her conviction reversed based on errors that, more probably than not, did not affect the verdict or judgment.[28] When the appellate courts conduct a harmless error analysis using Tenn. R.App. P.

---

**21.** Addison K. Goff, IV, *Mixed Signals: A Look at Louisiana's Experience with Harmless Error in Criminal Cases*, 59 La. L.Rev. 1169, 1177 (1999) ("Goff"); *see also* Saltzburg, 59 Va. L.Rev. at 989.

**22.** Goff, 59 La. L.Rev. at 1177; *see also* Saltzburg, 59 Va. L.Rev. at 989. Justice Traynor reinforced this point in his definitive book on harmless error when he noted that

The evaluation of an error as harmless or prejudicial is one of the most significant tasks of an appellate court, as well as one of the most complex. Each evaluation bears upon our traditional understanding that fair trial encompasses not only fair notice and an adequate opportunity to be heard before the appropriate tribunal, but also an orderly presentation of evidence and a rational application of the law thereto.

Traynor, at 80.

**23.** *See* Harry T. Edwards, *To Err is Human, But Not Always Harmless: When Should Legal Error be Tolerated?*, 70 N.Y.U. L.Rev. 1167, 1170 (1995) ("Edwards").

**24.** Bennett L. Gershman, *The New Prosecutors*, 53 U. Pitt. L.Rev. 393, 425 (1992).

**25.** Winslow, 64 Cornell L.Rev. at 544.

**26.** Goldberg, 71 J.Crim. L. & Criminology at 439.

**27.** *See* Vilija Bilaisis, Comment, *Harmless Error Abettor of Courtroom Misconduct*, 74 J.Crim. L. & Criminology 457, 458–59 (1983).

**28.** The Supreme Court of Florida has observed that the critical core of harmless error review is to adopt a "principled analysis which will afford the accused a fair trial while at the same time not make a mockery of criminal prosecutions by elevating form over substance." *State v. DiGuilio*, 491 So.2d 1129, 1135 (Fla.1986).

36(b), they must be careful to avoid becoming a second jury[29] by conflating the harmlessness inquiry with their own assessment of the defendant's guilt.[30] The analysis is more than simply a calculation of whether sufficient evidence exists to support the conviction.[31] It requires a careful examination of the entire record to determine whether the non-constitutional error involving a substantial right "more probably than not affected the judgment or would result in prejudice to the judicial process." *See State v. Toliver*, 117 S.W.3d at 231 (finding an error to be harmful even though the evidence was legally sufficient to affirm the convictions); *see also State v. Denton*, 149 S.W.3d at 15–17; *Blankenship v. State*, 219 Tenn. 355, 360, 410 S.W.2d 159, 161 (1966); *Peek v. State*, 21 Tenn. (2 Hum.) at 88.

### D.

■ The pivotal question in this case is whether the admission of the evidence suggesting that Mr. Rodriguez possessed child pornography was harmless error. Mr. Rodriguez asserts that this evidence undermined the fairness of his trial and was, therefore, not harmless error. The State, on the other hand, asserts that erroneous admission of the evidence was harmless because "the evidence of the defendant's guilt is very strong." We have determined

that Mr. Rodriguez has the better argument.·

The Court of Criminal Appeals concluded that the trial court erred by admitting evidence suggesting that Mr. Rodriguez viewed and possessed child pornography while he lived in W.W.'s house. In finding that the trial court erred by admitting this evidence, the intermediate appellate court offered the following cogent assessment:

[W]e must conclude that the trial court erred in allowing testimony that the defendant viewed pornography on his computer because a jury could infer from such evidence that the defendant had a propensity to commit child rape. Interestingly, in its pretrial argument for admission of the computer pornography evidence, the state said "[the computer pornography] goes to motive and intent to show that he has a thing for children." Again, evidence of a defendant's character is not admissible for the purpose of proving that the defendant acted in conformity with that character, nor is evidence of other crimes, wrongs, or bad acts admissible to prove the character of a person to show action in conformity with that character. Tenn. R. Evid. 404. Such evidence has little probative value and would likely engender substantial prejudice. Therefore, it was error to admit this evidence.[32]

---

29. Traynor, at 21.

30. Edwards, 70 N.Y.U. L.Rev. at 1170.

31. The United States Supreme Court has drawn a similar distinction between ascertaining whether the legally admissible evidence is sufficient to support the jury's verdict and whether the erroneously admitted evidence contributed to the verdict. *See, e.g., O'Neal v. McAninch*, 513 U.S. 432, 437–38, 115 S.Ct. 992, 130 L.Ed.2d 947 (1995); *United States v. Lane*, 474 U.S. 438, 449, 106 S.Ct. 725, 88 L.Ed.2d 814 (1986); *Kotteakos v. United States*, 328 U.S. at 763–65.

32. The trial court admitted the evidence based on its belief that the computer pornography easily could have been transferred from the computer in the living room to the television in the bedroom. The Court of Criminal Appeals determined the evidence simply did not support this conclusion. We note that this incident occurred in 1998. There is absolutely no evidence in the record that would have bolstered the conclusion that in 1998 Mr. Rodriguez had the technology available to him in W.W.'s home and the technical knowhow to freely transfer images from computer disks to a DVD. Furthermore, the pornography on the computer disks consists of individ-

*State v. Rodriguez,* 2007 WL 551245, at *5. However, the intermediate appellate court also found the admission of this evidence was harmless error.

■■■ While the State does not take issue with the Court of Criminal Appeals' decision that the trial court erred by admitting the challenged evidence, it insists that the admission of this evidence was harmless. Because errors in the admission of evidence do not normally take on constitutional dimensions, *State v. Powers,* 101 S.W.3d at 397, the question before this Court is whether, applying Tenn. R.App. P. 36(b), the admission of this evidence more probably than not affected the verdict or resulted in prejudice to the judicial process.

Neither the importance placed by the State in offering evidence that Mr. Rodriguez viewed or possessed child pornography nor its purpose in doing so can be doubted. The State's case consisted of the testimony of six witnesses. Four of these witnesses offered evidence that bolstered the prosecution's effort to establish that Mr. Rodriguez viewed child pornography on the computer in W.W.'s house, and two of the witnesses were called solely for this purpose. Arguing against Mr. Rodriguez's motion-in-limine to exclude such testimony, the State asserted that the testimony should be permitted because "it goes to motive and intent to show that he has a thing for children." Demonstrating that Mr. Rodriguez "has a thing for children" falls squarely within the category of propensity evidence.

The potential harm of propensity evidence that identifies a defendant in a child sexual assault case as a possessor of child

pornography is extremely high. As an initial matter, propensity evidence presents strongly persuasive proof. However, as noted by the United States Supreme Court, "[a]lthough 'propensity evidence' is relevant, the risk that a jury will convict for crimes other than those charged—or that, uncertain of guilt, it will convict anyway because a bad person deserves punishment—creates a prejudicial effect that outweighs ordinary relevance." *Old Chief v. United States,* 519 U.S. 172, 181, 117 S.Ct. 644, 136 L.Ed.2d 574 (1997) (quoting *United States v. Moccia,* 681 F.2d 61, 63 (1st Cir.1982)). As was well explained by Justice Jackson more than half a century ago, such evidence is extremely powerful but unduly prejudicial testimony:

Courts that follow the common-law tradition almost unanimously have come to disallow resort by the prosecution to any kind of evidence of a defendant's evil character to establish a probability of his guilt. Not that the law invests the defendant with a presumption of good character, but it simply closes the whole matter of character, disposition and reputation on the prosecution's case-in-chief. The State may not show defendant's prior trouble with the law, specific criminal acts, or ill name among his neighbors, even though such facts might logically be persuasive that he is by propensity a probable perpetrator of the crime. The inquiry is not rejected because character is irrelevant; on the contrary, it is said to weigh too much with the jury and to so over persuade them as to prejudge one with a bad general record and deny him a fair opportunity to defend against a particular

ual images rather than a pornographic film, which is what was described by J.Y. Additionally, J.Y. did not indicate that it was child pornography that was shown on the television. Like the Court of Criminal Appeals, we

simply conclude that there is no evidentiary basis to support this theory for admitting the evidence suggesting Mr. Rodriguez viewed and possessed child pornography.

charge. The overriding policy of excluding such evidence, despite its admitted probative value, is the practical experience that its disallowance tends to prevent confusion of issues, unfair surprise and undue prejudice.

*Michelson v. United States*, 335 U.S. 469, 475–76, 69 S.Ct. 213, 93 L.Ed. 168 (1948) (citation omitted) (footnotes omitted). This Court has likewise noted that the danger of "a jury improperly convicting a defendant for his or her bad character or apparent propensity or disposition to commit a crime regardless of the strength of the evidence concerning the offense on trial" is particularly strong "when the conduct or acts are similar to the crimes on trial." *State v. Rickman*, 876 S.W.2d 824, 828 (Tenn.1994).

In addition to the dangers posed by the use of propensity evidence in general, "[t]here is no subject which elicits a more passionate response than the sexual exploitation of children. Society abhors, and rightfully so, the victimization of the defenseless child." *United States v. Villard*,

700 F.Supp. 803, 809 (D.N.J.1988); *see also Werne v. State*, 750 N.E.2d 420, 424 (Ind.Ct.App.2001). The public has become acutely aware of and concerned about the dangers posed by those who exploit children. Accordingly, the electorate through their representatives have now moved through several rounds of legislation designed to combat the threat posed by child pornography.[33]

The public perceives, elected legislatures have declared, and researchers have found that a correlation exists between possession of child pornography and the commission of acts of child molestation.[34] Thus, "[w]hile not all consumers of child pornography abuse children, the congruence of abusers and pornography is troubling and supports some connection, although not necessarily causal, between the person who looks at child sex and the person who has sex with children."[35] When presented with propensity evidence suggesting that Mr. Rodriguez possessed and viewed child pornography, the jury could conclude, just as the State intended, that he "has a thing

---

**33.** *See, e.g.,* Danielle R. Dallas, *Starting with the Scales Tilted: The Supreme Court's Assessment of Congressional Findings and Scientific Evidence in Ashcroft v. Free Speech Coalition,* 44 Willamette L.Rev. 33, 35–36 (2007); Stephen T. Fairchild, Note, *Protecting the Least of These: A New Approach to Child Pornographic Pandering Provisions,* 57 Duke L.J. 163, 170–71 (2007); Daniel M. Filler, *Making the Case for Megan's Law: A Study in Legislative Rhetoric,* 76 Ind. L.J. 315, 357–58 (2001); Marc D. Goodman & Susan W. Brenner, *The Emerging Consensus on Criminal Conduct in Cyberspace,* 10 Int'l J.L. & Info. Tech. 139, 154 n. 97 (2002).

**34.** *See, e.g.,* Daniel S. Armagh, *Virtual Child Pornography: Criminal Conduct or Protected Speech?,* 23 Cardozo L.Rev.1993, 1996–98 (2002); Candice Kim, *From Fantasy to Reality the Link Between Viewing Child Pornography and Molesting Children,* 39–APR Prosecutor 17 (2005); Lynne Marie Kohm & Maria E. Lawrence, *Sex at Six: The Victimization of*

*Innocence and Other Concerns over Children's "Rights,"* 36 Brandeis J. Fam. L. 361, 387–88 (1997–1998); Lydia W. Lee, Note, *Child Pornography Prevention Act of 1996: Confronting the Challenges of Virtual Reality,* 8 S. Cal. Interdisc. L.J. 639, 668–70 (1999); Brian W. McKay, Note, *Guardrails on the Information Superhighway: Supervising Computer Use of the Adjudicated Sex Offender,* 106 W. Va. L.Rev. 203, 205–09 (2003); Sheila J. Winkelman, *Making a Woman's Safety More Important than Peep Shows: A Review of the Pornography Victims' Compensation Act,* 44 Wash. U.J. Urb. & Contemp. L. 237, 252–53 (1993); Debra Wong Yang & Patricia A. Donahue, *Protecting Children From Online Exploitation and Abuse: An Overview of Project Safe Childhood,* 34 Pepp. L.Rev. 439, 444–53 (2007).

**35.** Josephine R. Potuto, Stanley + Ferber = *The Constitutional Crime of At–Home Child Pornography Possession,* 76 Ky. L.J. 15, 26 (1988).

for children." While such evidence may be permissible for certain purposes, it is prohibited under the current rules of evidence for the purpose of establishing the defendant's predilection towards sexualizing minors.

▮▮▮▮ The harmful effects of propensity evidence that undermines a defendant's credibility increase in close cases when the outcome depends on the jury's assessment of the witnesses' credibility. Errors in admitting evidence are less likely to be harmless in close cases. *Blankenship v. State*, 219 Tenn. at 360, 410 S.W.2d at 161. Propensity evidence affects the jury's assessment of whom to believe in a case that rises and falls upon assessments of credibility. *See, e.g., State v. Mallard*, 40 S.W.3d at 489; *State v. Thompson*, 36 S.W.3d 102, 113 (Tenn.Crim.App.2000); *see also State v. James*, 81 S.W.3d 751, 763–64 (Tenn.2002); *State v. Dutton*, 896 S.W.2d 114, 117 (Tenn.1995); *State v. Dooley*, 29 S.W.3d at 555. This danger is particularly acute where the character or credibility defect is one that garners the understandable public revulsion that is directed by the public towards sexually exploitative acts towards children, including the possession of child pornography. *See, e.g., State v. Dutton*, 896 S.W.2d at 117; *Collins v. Arnold*, 2007 WL 4146025, at *33 (Tenn.Ct.App.2007) (Koch, J., concurring).[36] Simply stated, presenting evidence suggesting that the defendant in a child sexual assault case possessed and viewed child pornography for no other purpose than establishing a predilection toward sexually abusing children places a defendant "in a highly prejudiced posture before the jury" and has "the effect of converting the trial from an assessment of

the charges against [the defendant] to a general inquiry as to his character." *Staton v. Commonwealth*, No. 1362–01–4, 2002 WL 1792094, at *4 (Va.Ct.App. Aug.6, 2002).

The only evidence that Mr. Rodriguez sexually abused the two children was the testimony of the children themselves. Thus, the outcome of the prosecution hinged on the jury's assessment of the credibility of the two children and of Mr. Rodriguez. The State's sole reason for placing evidence that Mr. Rodriguez viewed or possessed child pornography was "to show [the jury] that he has a thing for children." This propensity evidence, more probably than not, made it easier for the jury to disbelieve Mr. Rodriguez. It also freed the jury to conclude more comfortably that Mr. Rodriguez had sexually abused the two children.

In the foreword of his noted book on harmless error, Justice Traynor observed that "[e]rrors are the insects in the world of law, traveling through it in swarms, often unnoticed in their endless procession. Many are plainly harmless; some appear ominously harmful. Some, for all the benign appearance of their spindly traces, mark the way for a plague of followers that deplete trials of fairness."[37] He also noted that inquiring into what makes error harmless is "an intensely practical inquiry into the health and sanitation of the law."[38] Based on the record in this case, the propensity evidence introduced by the State undermined the fairness of Mr. Rodriguez's trial and, more probably than not, affected the jury's assessment of the credibility to the witnesses and, therefore, af-

---

**36.** *See also United States v. Johnson*, 439 F.3d 884, 885–90 (8th Cir.2006); *Werne v. State*, 750 N.E.2d at 424; *State v. Morrissey*, No. 25199–0–II, 2001 WL 30055, at *1 (Wash.Ct. App. Jan.12, 2001).

**37.** Traynor, at 9.

**38.** Traynor, at 9.

fected the verdict of guilt. Accordingly, we simply cannot conclude that the erroneous admission of this evidence was harmless under Tenn. R.App. P. 36(b).

### III.

Based on our review of the record and the applicable authorities, we hold that the Court of Criminal Appeals was correct when it determined that the trial court erred by admitting the evidence regarding Mr. Rodriguez's possession of child pornography. However, we hold that the Court of Criminal Appeals erred by concluding that the admission of this evidence was harmless. Our analysis of the record in accordance with Tenn. R.App. P. 36(b) leads us to the conclusion that the erroneous admission of this evidence, more probably than not, affected the verdict. Accordingly, the judgment of the Court of Criminal Appeals is affirmed in part and reversed in part, and the case is remanded to the trial court for a new trial consistent with this opinion.[39] The costs of the appeal are taxed to the State of Tennessee.

---

**39.** In light of our decision to grant Mr. Rodriguez a new trial because of the erroneous admission of evidence regarding his possession of child pornography, we need not address Mr. Rodriguez's issue regarding the trial court's denial of his motions for a mistrial following two witnesses' allusions to uncharged sexual conduct by Mr. Rodriguez.

Evidence of uncharged sexual conduct is generally inadmissible during the State's case-in-chief. *State v. Rickman,* 876 S.W.2d at 825; *State v. Woodcock,* 922 S.W.2d 904, 911 (Tenn.Crim.App.1995). On remand, both the State and the defense should proceed with caution to avoid improper references to uncharged sexual conduct by Mr. Rodriguez.