# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs July 18, 2012

## STATE OF TENNESSEE v. JIMMY JACKSON

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2010-A-392      Cheryl Blackburn, Judge**

---

**No. M2011-01077-CCA-R3-CD - Filed November 21, 2012**

---

A Davidson County Criminal Court Jury convicted the appellant, Jimmy Jackson, of one count of selling .5 grams or more of cocaine within a drug-free school zone and one count of delivering .5 grams or more of cocaine within a drug-free school zone, Class B felonies. The trial court merged the convictions and sentenced him as a Range II offender to fourteen years. On appeal, the appellant contends that the trial court erred by ruling he could not question a State's witness about conduct involving dishonesty pursuant to Tennessee Rule of Evidence 608(b) and that the trial court erred by refusing to instruct the jury on facilitation. Based upon the record and the parties' briefs, we conclude that the trial court erred by refusing to instruct the jury on facilitation and that the error was not harmless. Therefore, the appellant's convictions are reversed, and the case is remanded to the trial court for a new trial.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court are Reversed, and the Case is Remanded.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JOSEPH M. TIPTON, P.J., and D. KELLY THOMAS, JR., J., joined.

Emma Rae Tennent and Jason Gichner (on appeal) and Chad Hindman and Gary Tamkin (at trial), Nashville, Tennessee, for the appellant, Jimmy Jackson.

Robert E. Cooper, Jr., Attorney General and Reporter; Benjamin A. Ball, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and Bret Gunn, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### I. Factual Background

Officer Jacob Pilarski of the Metropolitan Nashville Police Department (MNPD) testified at trial that on March 26, 2009, he received a telephone call from a confidential informant (CI) with whom he had previously worked. Officer Pilarski said the CI told him that "there was a gentleman he had met and could hook me up." Officer Pilarski said the CI referred to the man as "six nine," and Officer Pilarski spoke with the man over the telephone. Officer Pilarski said he told the man that his name was "CJ" and that he wanted one-half ounce of crack cocaine. The man told the officer that he could "get it, no problem" and arranged to meet the officer at the Exxon TigerMart on the corner of Charlotte Pike and 15th Avenue North. The man said he would be standing beside a black Mercury Cougar.

Officer Pilarski testified that about one hour later, he drove to the TigerMart in an unmarked car and saw a man, who was later identified as the appellant, standing beside a black Cougar. The appellant approached Officer Pilarski's car and asked if he was CJ. Officer Pilarski gave the appellant $600 in twenty-dollar bills, and the appellant gave him a plastic bag containing a white rock substance. Officer Pilarski smelled the substance, and the appellant told him, "[O]h, it's real, don't worry about it, it's real." Officer Pilarski said that he gave the "take down signal" and that officers arrested the appellant as he was walking "outbound on Charlotte Pike." After the arrest, Officer Pilarski met with the CI. He also spoke with the appellant and recognized the appellant's voice as the voice of the man he talked with over the telephone. The substance in the bag field-tested positive for cocaine base, also known as crack cocaine.

On cross-examination, Officer Pilarski acknowledged that many CIs were criminals. He said that the CI in this case owned the black Cougar and that the CI was present during the drug buy. He acknowledged that he testified at the appellant's preliminary hearing and that he did not say at the hearing the CI was present. He said that he did not say the CI was present because "I had never been asked" and that the CI had "absolutely, absolutely no interaction in the deal."

Lieutenant Douglas Bell of the MNPD testified that on March 26, 2009, Officer Pilarski advised him about "a deal set up that would be a take down." Lieutenant Bell and other officers went to the predetermined location. Lieutenant Bell was in an unmarked police car and parked at a muffler shop across the street from the TigerMart. He saw Officer Pilarski pull into the parking lot and saw a very tall African-American man walk to Officer Pilarski's car. Officer Pilarski had a wire radio in the car, and Lieutenant Bell could hear what was happening. However, he did not remember Officer Pilarski's conversation with the appellant. Lieutenant Bell said that he saw the appellant and Officer Pilarski "engaging in some sort of interaction" and that he saw officers arrest the appellant.

On cross-examination, Lieutenant Bell testified that the black Cougar was in the TigerMart parking lot when he arrived at the muffler shop. He did not pay attention to whether another person was in the Cougar.

John Scott, Jr., a forensic scientist with the Tennessee Bureau of Investigation, testified as an expert in forensic chemistry that he tested the white substance received by Officer Pilarski. The substance was cocaine base and weighed 8.2 grams.

Officer Joshua Walters of the MNPD testified that he was one of the "take-down" officers on March 26, 2009, and was parked in a daycare center parking lot, just west of the TigerMart. He could not see the drug transaction but listened to the transaction on a police wire. When Officer Pilarski gave the take-down signal, Officer Walters and another officer arrested the appellant as he was walking on Charlotte Pike. The appellant was holding $600 in twenty-dollar bills.

The then fifty-two-year-old appellant testified that he was married and had three daughters. The appellant said that on March 26, 2009, the CI, whom he knew as "Ron," came to his house. The appellant had known Ron for two to three years, had met him on constructions jobs, and knew Ron was involved in drug transactions. The appellant said that Ron claimed "he had these two white guys that wanted some drugs" and that Ron offered to pay him $50 to "ride down to Exxon TigerMart with him to do this." The appellant was unemployed, and his wife was in the hospital. He needed the money, so he agreed to go with Ron.

The appellant testified that Officer Pilarski pulled into the parking lot. Ron had the hood of the Cougar up and was putting oil in the car, so the appellant walked to Officer Pilarski's car and asked, "[Y]ou CJ?" Officer Pilarski said yes, and the appellant walked back to the Cougar. He said that Ron told him to take the cocaine to the buyer and then go into the TigerMart and buy beer and cigarettes. The appellant gave the cocaine to Officer Pilarski, Officer Pilarski gave him the money, and the appellant went into the TigerMart. When he came out of the store, the Cougar was leaving the parking lot. The appellant walked to the side of the building, and officers arrested him. He said that he did not own a cellular telephone and that he did not have a phone on his person when the police arrested him. He said that he was not a drug dealer and that he had never sold drugs. The appellant acknowledged that he was convicted of grand larceny in Mississippi in 1995 and 1998 and felony theft in Tennessee in 2008. However, he had no prior drug convictions.

On cross-examination, the appellant testified that he never spoke with Officer Pilarski over the telephone. He said that he was six feet, five inches tall and that he had never gone by the name "six nine." He said that he helped Ron because he needed money in order to get

his wife an asthma pump and that he was going to serve as Ron's "back up" in case something happened at the TigerMart. He said he knew when he went to the TigerMart that he was going to participate in a drug transaction. He denied telling officers after his arrest that he would arrange to set up his supplier if the officers would let him go. He also denied telling them that his supplier was in a car in the TigerMart parking lot.

Officer Pilarski testified on rebuttal for the State that when he pulled into the TigerMart parking lot, the appellant walked directly to him. The appellant gave him the crack cocaine, Officer Pilarski gave the money to the appellant, and the appellant walked toward Charlotte Pike. The appellant did not go into the store. Officer Pilarski said that after the appellant's arrest, he learned the appellant "possibly wanted to work out a deal." The appellant offered to order nine ounces of cocaine from a large supplier and have officers follow him so the officers could intercept the drugs. Officer Pilarski returned the $600 to the appellant, and officers followed the appellant to a house. Officer Pilarski said the appellant came out of the house and gave him a "story." Officers then followed the appellant for the next two and one-half hours. Officer Pilarski said he finally decided that "this [was] just a scheme to try to get away" and that the appellant was leading them on a "wild goose chase," so officers took the appellant back into custody.

On cross-examination, Officer Pilarski acknowledged that officers searched the appellant after his initial arrest. The appellant did not have a cellular telephone or any money on his person other than the $600.

Officer Walters also testified on rebuttal for the State that after the appellant's arrest, the appellant told him that "he was serving that cocaine for someone else." The appellant claimed the person was in the DB Todd/Charlotte Pike area, not far from the TigerMart. The appellant offered to set up his supplier.

The jury convicted the appellant as charged of one count of selling .5 grams or more of cocaine within a drug-free school zone and one count of delivering .5 grams or more of cocaine within a drug-free school zone, Class B felonies. After a sentencing hearing, the trial court merged the convictions and sentenced the appellant as a Range II, multiple offender to fourteen years to be served as twelve years at 100% followed by two years at 35%.

## II. Analysis

### A. Tennessee Rule of Evidence 608(b)

The appellant contends that the trial court erred by ruling he could not question Officer Pilarski about conduct involving dishonesty pursuant to Tennessee Rule of Evidence

-4-

608(b). The State argues that the trial court did not abuse its discretion by ruling that the appellant could not question the officer. We agree with the State.

Before trial, the appellant filed a motion in limine, requesting a jury-out hearing to determine whether the appellant could question Officer Pilarski about conduct involving dishonesty pursuant to Rule 608(b), Tennessee Rule of Evidence. According to the motion, in July 2007, Officer Pilarski was suspended for five days "after he threw away the initial report that was completed by another officer and then submitted another report eliminating all references to cocaine after an arrestee died of a cocaine overdose."

During the pretrial hearing, the trial court stated that it had reviewed the Complaint Resolution Proposal regarding the 2005 incident. The court ruled that the defense could not cross-examine the officer about the incident at the appellant's trial because the report concluded that the officer's conduct was negligent, not dishonest. However, the trial court allowed the defense to make an offer of proof regarding the officer's testimony.

Officer Pilarski testified that in 2005, he participated in the arrest of Calvin Branch. He acknowledged that Branch later died from cocaine swallowed at the scene of the arrest and that he had known Branch swallowed cocaine. Defense counsel asked, "And you didn't report that to anybody or recommend that he [get] any kind of medical attention?" The officer answered, "Not exactly." He explained,

> [Branch] admitted on the scene that he swallowed a small amount of cocaine. He specifically described it as a fingernail amount, just enough to lace a blunt. He explained that to myself. Actually he explained that to my sergeant, John Bourque. He didn't even tell me that. I was present during the interview. He explained that to my sergeant, John Bourque. There was also a lieutenant on the scene at the time. At that point my experience was, you know, that small amount I had taken to -- I had taken people that had swallowed that before to booking many times. You know, to me it's no different than if somebody smokes crack cocaine or snorts it or is highly intoxicated. It's still in the system. I have no idea of how it breaks down or if it breaks down differently. He was taken to booking. Now, I wasn't the arresting officer. I was the assisting officer.

Officer Pilarski testified that after Branch's arrest, Officer Brad Bracey arrived at the scene and, unknown to Officer Pilarski, wrote an offense report "from what he believed

happened." The report stated that officers saw cocaine in Branch's mouth, which was not true. Officer Pilarski read the offense report, told Officer Bracey that it was incorrect, and rewrote the report. After Branch died, an investigation into his death resulted in Officer Pilarski's being disciplined. Officer Pilarski said he was disciplined because "my arrest report narrative should have matched my offense report narrative. . . . They said I included all the information, I just should have had it in both places." Officer Pilarski stated that although he, his sergeant, and his lieutenant knew Branch swallowed cocaine, they did not seek medical treatment for Branch because "we really didn't think anything about it."

At the conclusion of Officer Pilarski's testimony, the trial court stated, "I stand by my earlier [ruling] -- there's no specific instances of conduct that go to truthfulness or untruthfulness with regard to this incident." In the event the appellant raised the issue on direct appeal, the trial court ordered that the Complaint Resolution Proposal be filed under seal for this court's review.

Tennessee Rule of Evidence 608(b) provides that

> [s]pecific instances of conduct of a witness for the purpose of attacking or supporting the witness's character for truthfulness, other than convictions of crime as provided in Rule 609, may not be proved by extrinsic evidence. They may, however, if probative of truthfulness or untruthfulness . . . , be inquired into on cross-examination.

Before a witness can be questioned, the trial court, upon request, must hold a hearing to determine whether "the alleged conduct has probative value and that a reasonable factual basis exists for the inquiry." Tenn. R. Evid. 608(b)(1). This court reviews a trial court's ruling under Tenn. R. Evid. 608(b) under an abuse of discretion standard. State v. Reid, 91 S.W.3d 247, 303 (Tenn. 2002).

The appellant contends that the trial court erred by not allowing him to question Officer Pilarski about the 2005 incident because "[d]efense counsel offered a signed document wherein Pilarski acknowledged dishonest conduct. He not only destroyed another officer's report and substituted an amended report leaving out crucial information, but also accepted a suspension from the Police Department for his actions."

We have carefully reviewed the Complaint Resolution Proposal, which was prepared by the MNPD, details Officer Pilarski's actions during and after Branch's arrest, and was signed by Officer Pilarski and his supervisors. The MNPD's conclusions in the report support the trial court's ruling that Officer Pilarski's actions regarding the preparation of the

new offense report constituted negligence. Moreover, the report does not offer an opinion on the officer's character for truthfulness or suggest that he has a reputation for untruthfulness. Despite the appellant's claim to the contrary, Officer Pilarski did not acknowledge dishonest conduct in the report. During the pretrial hearing, Officer Pilarski explained his actions and, again, did not acknowledge any dishonest conduct. Therefore, we cannot say that the trial court abused its discretion by determining that the appellant could not cross-examine the officer about the 2005 incident.

## B. Facilitation Instruction

The appellant contends that the trial court erred by failing to instruct the jury on facilitation as a lesser-included offense of the charged offenses. The State acknowledges that "[a]rguably, the defendant's testimony that he believed that a man known to him as Ron intended to engage in a drug transaction and that he furnished him with substantial assistance provided sufficient evidence to justify an instruction on facilitation." However, the State maintains that the trial court's error was harmless. We conclude that the trial court should have instructed the jury on facilitation and that the trial court's error was not harmless. Therefore, the appellant's convictions must be reversed, and the case must be remanded to the trial court for a new trial.

Before trial, the appellant filed a motion requesting that the trial court instruct the jury on facilitation. The appellant renewed the motion after the State presented its case-in-chief, but the trial court denied the motion because the defense had not yet presented any evidence to warrant giving the instruction. After the close of all the proof, the defense again requested that the trial court instruct the jury on facilitation. However, the trial court refused, stating, that "there is no evidence whatsoever that this other person was involved in a crime." The trial court also stated that "you're not asking for facilitation. You're asking for the attempt." The defense maintained that the proof warranted a facilitation instruction. The trial court disagreed but offered to instruct the jury on the attempt to sell and deliver cocaine. The defense accepted the trial court's offer of an attempt instruction.

In criminal cases, the trial court has the duty to charge the jury on all of the law that applies to the facts of the case. See State v. Harris, 839 S.W.2d 54, 73 (Tenn. 1992) (citing State v. Thompson, 519 S.W.2d 789, 792 (Tenn. 1975)). A defendant also "has a right to have every issue of fact raised by the evidence and material to his defense submitted to the jury upon proper instructions by the judge." Thompson, 519 S.W.2d at 792; see also Tenn. Code Ann. § 39-11-203(c) (a defendant is entitled to have a defense submitted to the jury when it is fairly raised by the proof). "In applying the lesser-included offense doctrine, three questions arise: (1) whether an offense is a lesser-included offense; (2) whether the evidence supports a lesser-included offense instruction; and (3) whether an instructional error is

harmless." State v. Allen, 69 S.W.3d 181, 187 (Tenn. 2002).

Facilitation of a felony occurs when a defendant knows that "another intends to commit a specific felony" and "knowingly furnishes substantial assistance" in committing that felony. Tenn. Code Ann. § 39-11-403(a) (also directing that the facilitating defendant is one who lacks "the intent required for criminal responsibility"). Facilitation is a lesser included offense of the charged offenses under the Burns test, part (c)(1). See State v. Burns, 6 S.W.3d 453, 466-67 (Tenn. 1999).

The evidence in the record before us shows that on March 26, 2009, the CI telephoned Officer Pilarski and said he knew someone who could "hook [Officer Pilarski] up." Officer Pilarski spoke with the man over the telephone, and the man arranged to meet the officer at the TigerMart. When Officer Pilarski arrived, the appellant, who was standing by the CI's black Cougar, walked to the officer's car and gave the officer crack cocaine in exchange for $600. As the appellant was walking away on Charlotte Pike, officers arrested him. At trial, the appellant testified that the CI, whom he knew as "Ron," contacted him and offered to pay him $50 if he would accompany Ron to the TigerMart. The appellant said that he knew he was going to participate in a drug transaction but that he was not a drug dealer and was just assisting Ron. When the appellant was arrested, he did not have a cellular telephone on his person or any cash other than the $600. Although Officer Pilarski testified that the appellant offered to set up his supplier, the appellant never did so. One of the State's own witnesses, Officer Walters, testified on rebuttal for the State that he arrested the appellant and that the appellant claimed he was "serving that cocaine for someone else." Therefore, we conclude that the proof supported an instruction on the lesser-included offense of facilitation.

Next, we must determine whether the trial court's failure to give the requested instruction was harmless error. A trial court's failure to instruct on a lesser-included offense is a non-structural constitutional error. State v. Brown, 311 S.W.3d 422, 434 (Tenn. 2010). Non-structural constitutional errors do not require automatic reversal. "However, the burden on the State to demonstrate that a non-structural constitutional error is harmless remains quite stringent. The existence of a non-structural constitutional error requires reversal unless the State demonstrates beyond a reasonable doubt that the error is harmless." State v. Rodriguez, 254 S.W.3d 361, 371 (Tenn. 2008).

Upon reviewing the record, we are unable to conclude that the trial court's failure to instruct the jury on the lesser-included offense of facilitation was harmless beyond a reasonable doubt. Ample evidence exists to support convictions for facilitation to sell .5 grams or more of cocaine within a drug-free school zone and facilitation to deliver .5 grams or more of cocaine within a drug-free school zone. However, the jury did not have the opportunity to consider the appellant's role as a facilitator. Therefore, we must reverse his

convictions and remand the case for a new trial.

## III. Conclusion

Based upon the record and the parties' briefs, the appellant's convictions are reversed, and the case is remanded to the trial court for further proceedings consistent with this opinion.

_____
NORMA McGEE OGLE, JUDGE