IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
January 17, 2018 Session

## STATE OF TENNESSEE v. DEXTER OCTAVIUS PARKER

**Appeal from the Circuit Court for Coffee County**
**No. 38656     L. Craig Johnson, Judge**

_____

**No. M2017-00477-CCA-R3-CD**

_____

Defendant, Dexter Octavius Parker, was indicted for attempted first degree murder in Count One, "aggravated domestic assault" in Count Two, and especially aggravated kidnapping in Count Three. After a jury trial, Defendant was convicted of attempted second degree murder in Count One, aggravated assault in Count Two, and especially aggravated kidnapping in Count Three. He received a total effective sentence of forty-six years. On appeal, Defendant argues that the trial court improperly excluded the conclusion of one expert witness while allowing the conclusion of another expert witness regarding Defendant's mental state. Defendant also argues that the trial court erred by reinstating and amending Count Two of the indictment after dismissing it during the trial. Concluding that the trial court committed structural constitutional error by reinstating Count Two of the indictment, we reverse and vacate the judgment in Count Two and affirm the judgments in Counts One and Three.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Reversed and Vacated in part and Affirmed in part.**

TIMOTHY L. EASTER, J., delivered the opinion of the court, in which THOMAS T. WOODALL, P.J., and ROBERT. L. HOLLOWAY, JR., J., joined.

Jeffrey E. Schofill, Tullahoma, Tennessee, for the appellant, Dexter Octavius Parker.

Herbert H. Slatery III, Attorney General and Reporter; M. Todd Ridley, Assistant Attorney General; Craig Northcott, District Attorney General; and Kristy West, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

*Factual and Procedural Background*

In June of 2011, a Coffee County Grand Jury indicted Defendant for attempted first degree murder in Count One, "aggravated domestic assault" in Count Two, and especially aggravated kidnapping in Count Three. A jury trial commenced on October 1, 2013. On the first day of trial, the trial court sought clarification on Count Two of the indictment. Count Two of the indictment stated:

> THE GRAND JURORS OF COFFEE County, Tennessee, duly impaneled and sworn, upon their oath, present that DEXTER OCTAVIUS PARKER on the ___ Day of [M]arch, 2011, in COFFEE County, Tennessee, and before finding of this indictment, unlawfully, intentionally and knowingly did assault [the victim], causing bodily injury to the said victim while using or displaying a deadly weapon, to wit, A BROKEN GLASS BOTTLE, as used said offense being a Domestic Assault in violation of T.C.A. 39-13-102(a)(2)(A) and T.C.A. 39-13-111, and against the peace and dignity of the State of Tennessee.

After a recess following the direct examination of the victim, the trial court said, "I have searched and searched and searched and tried to put it together, and maybe you can help me. Aggravated domestic assault, what do you mean by that?" The State replied, "An aggravated assault and then coupled with the domestic assault – domestic statute in that there is a relationship between the parties." The trial court responded, "I am not sure that is an offense. I have looked at the statutes, and there is domestic assault. . . . I don't know that there is such a thing as aggravated domestic assault." The State agreed that there was no specific statute for aggravated domestic assault, but indicated its intention to prohibit Defendant's possession of firearms by introducing the domestic assault aspect to the charge.[1] Eventually the trial court implored both parties to look into the matter and said, "You may have to choose aggravated assault or domestic assault."

Around 10:10 a.m. on the second day of trial, the trial court asked, "Is there such a crime as aggravated domestic assault?" Defense counsel argued that neither aggravated domestic assault nor "T.C.A. § 39-13-102(a)(2)(A)" as cited in the indictment existed. The State argued that the indictment was clear as to the actions committed by Defendant and that the subsection of the statute referenced in the indictment was a clerical error. The State specifically mentioned *State v. Wade Tyler*, No. M2009-01762-CCA-R3-CD, 2011 WL 300145 (Tenn. Crim. App. Jan. 21, 2011), *perm. app. denied* (Tenn. Aug. 5, 2011), and argued that the incorrect citation to the statute in the indictment did not render

---

[1] We are baffled as to why the District Attorney General chose to include a reference to the domestic assault statute because a felony conviction for aggravated assault alone would make it illegal for Defendant to possess a firearm. *See* T.C.A. § 39-17-1307(b)(1)(A) (stating that it is an offense to possess a firearm after one has been convicted of a felony involving use of a deadly weapon).

it invalid. Eventually, the trial court made the State elect which offense that it wanted to pursue, and the State chose to pursue aggravated assault. The trial court then ruled that even though the word "domestic" was used in the indictment and the citation was incorrect, the indictment was "clear that he is being charged with aggravated assault."

Around 9:00 a.m. on the third day of trial, defense counsel brought the indictment issue up to the trial court before questioning began for the day. Defense counsel argued that Rule 7(b)(2) of the Tennessee Rules of Criminal Procedure forbade the trial court from amending the indictment without consent of the Defendant after jeopardy had attached. Defense counsel went on to argue that Count Two of the indictment was duplicitous, and thus should have been dismissed. The trial court acknowledged that the original indictment was duplicitous and that the trial court could not amend the indictment after jeopardy had attached. After a long discussion, the trial court finally concluded that the indictment charged the elements of two different crimes that would probably have to be merged for sentencing. The trial court dismissed Count Two of the indictment. Defense counsel asked the trial court to inform the jury of the dismissal of Count Two, but the trial court decided to hold off on informing the jury of the decision until the end of the trial.

After the mid-morning break that same day, the trial court informed the parties that it had conducted some research, reevaluated the indictment, and recanted the earlier ruling. The trial court only dismissed the "domestic enhancer" portion of Count Two and left the remainder of the indictment intact. The trial court said, "I believe the defendant was clearly provided ample notice of the offense charged, that being aggravated assault including the facts that constituted the offense, his name, and the date of the alleged offense, so with that said, the Court is not dismissing the entire indictment."

*The State's Proof*

The following narrative of events is derived from the testimony of the State's witnesses. In March of 2011, Defendant lived with the victim and her two young children in Coffee County, Tennessee. Defendant and the victim had been dating for around five months, and their relationship was tumultuous and abusive. Prior to this incident, Defendant had slapped the victim, choked the victim on three separate occasions, and cut the victim with a box cutter while she slept. Each time these abuses occurred, Defendant had been drinking.

On March 18, 2011, Defendant drove the victim to Sonic and dropped her off for work at around 7:00 a.m. At that time, Defendant was still "drunk from the night before and on cocaine." Defendant and the victim had stayed up all night drinking and partaking in cocaine. The victim could not sleep because Defendant "kept crawling around on the floor with a stick . . . [and l]ooking out the window." During the day, Defendant drove to

Sonic with the victim's children four or five times. The victim told Defendant to take the children to daycare, but Defendant kept the children with him. Defendant eventually locked the only set of keys inside the car at the victim's house. The victim called her mother to pick her up from work and a locksmith to unlock the car. Once the car was unlocked, Defendant, the victim, and her two children when to the victim's mother's house to drop off her oldest son. After that, Defendant, the victim, and her youngest son went to the liquor store. Defendant took money given to him by the victim and purchased a bottle of liquor. Next, they all went to Hastings and rented the movie Avatar.[2] While in the car, Defendant and the victim had no arguments. However, the victim noted, "He was just still like up on cocaine from the whole day and night before. . . . He was, I guess, geeked." According to the victim, a person is "geeked" when they are "[h]igh, looking out the window, [and] paranoid."

Once back at the victim's house, they watched Avatar in the living room while the victim attempted to get her son to sleep. When speaking about the movie Avatar, the victim described the characters as "Giant Lizards" that were "blue." She remembered one of the "giant lizards" falling in love with a girl and there being "fighting" in the movie. During the movie, Defendant indicated to the victim that he wanted her to perform oral sex on him, but the victim did not want to. When the victim declined to perform oral sex on Defendant, he "got a little bit mad." He continued his requests until the victim explained that she was trying to get her son to sleep. Once her son was asleep, she moved him to the couch. Defendant and the victim then snorted "a little bit" of cocaine "once or twice." The victim also smoked an approximately seven inch long marijuana "blunt" at some point during the night. Defendant then suggested that he and the victim move the television into the bedroom. An argument broke out over shutting the door to the bedroom. Finally, the victim relented and shut the door.

Instead of watching the movie, Defendant told the victim, "Get against the wall and put your hands up." The victim complied. Defendant poured the contents of a liquor bottle on the floor. He then held the bottle upside down and began hitting the victim in the head with it. The victim tried to go out the door, but Defendant shut the door. The victim asked for Defendant to let her out, but Defendant would not allow her to leave. Defendant hit the victim approximately twenty times with the liquor bottle before the victim knocked the bottle away. Defendant then began punching her in the face. As Defendant beat her, the victim told him to stop and that she loved him. She asked, "Why are you doing this to me?" Defendant never replied. Defendant picked up the liquor bottle and began hitting the victim in the head, back, and legs. By this point, the victim

---

[2] Avatar is James Cameron's epic about a young marine that travelled to the fictional planet Pandora on a mission to infiltrate the native species of the planet, known as the Na'vi. *Avatar (2009 film)*, Wikipedia.org, https://en.wikipedia.org/wiki/Avatar_(2009_film) (last visited Apr. 11, 2018). The Na'vi are humanoid aliens with blue skin, large eyes, and tall, slender bodies. *Id.* During the mission, the young marine falls in love with a Na'vi female and participates in the resistance to his own mission. *Id.*

was sitting down in the corner of the room. She began crawling and stood up. As she was crawling, Defendant continued to hit her. She went for the door, but Defendant placed a hand on the door and would not let her leave. At some point, Defendant broke the liquor bottle by hitting the television and the wall, and the lights were turned off. Defendant started cutting the victim with the broken bottle, saying "he was going to kill everybody, but he was going to kill [the victim] first." The victim said that she was "bleeding to death." The victim suffered wounds to her head, face, legs, and arms. The victim "couldn't breathe" and "blood was coming from everywhere in [her] body." The victim believed Defendant was going to kill her. At some point, the victim grabbed a dresser drawer and tried to hit Defendant with it. The victim climbed on top of the nightstand and grabbed a CD player. She hit, or attempted to hit, Defendant with the CD player a "couple" of times, and then, tried to break out the window in the bedroom. The CD player only made a small hole in the window. To get away from Defendant, the victim jumped out the window. This attack took place over thirty to forty minutes.

After she escaped through the window, the victim ran to her neighbor's house. Billy Denby lived in the house next door to Defendant and the victim at the time of the attack. The victim knocked on Mr. Denby's door in the early morning hours. When he came to the door, the victim decided to lie down on the neighbor's porch. At the time, the victim felt "like [she] was dying." Mr. Denby recalled blood spattering everywhere when the victim knocked on the door. Mr. Denby called the police, put on his shoes, and went outside. Once outside, he noticed the victim was completely naked and "cut all to pieces." Mr. Denby and his wife fetched the victim a blanket and covered her until the police arrived. The victim repeated, "He's going to kill me. He's trying to kill me." While the victim was on Mr. Denby's porch, the police arrived. The victim told the police that her son was still in the house, and they put the victim inside an ambulance. The victim's memory of the details after jumping out the window was incomplete.

Once transported to the hospital, the victim underwent surgery for her injuries. Multiple injuries suffered by the victim required stitches or plastic surgery. Pictures of the injuries all over the victim's body were shown to the jury. Dr. Paul Haidak reviewed the victim's injuries. He opined that some of the deeper and more serious injuries were caused by Defendant and not by jumping through the window. Dr. Haidak was unable to definitively say that the injuries suffered by the victim were life threatening without more information regarding her blood loss.

Officers Mickey Blanton and Sam Campbell of the Tullahoma Police Department responded to the call and arrived at the scene quickly. When the police arrived, the victim was completely naked and covered in blood. When describing the victim, Officer Campbell said, "I hadn't seen somebody so much covered in blood. We couldn't tell if it was hers or somebody else's. There was just so much blood, and really something you almost just see out of the movies." Officer Blanton described her as "very disoriented."

He also noticed a deep wound to her breast, several cuts on her left wrist, and cuts on her head. When Officer Blanton inquired about what had happened, the victim replied, "My boyfriend [Defendant] beat me up." In response to Officer Blanton's question about Defendant's location, the victim pointed next door. Once the officers found out that children were possibly in the house, they searched and secured the outside of the house before proceeding inside. The officers circled the house, knocked on the door, and looked in the windows. After getting no response, the officers received consent from the victim to enter the house.

Officers Blanton and Campbell, along with Officers Michael Wilder, Holly Sparkman, and Alethia Wheeler, entered the house. Once inside, the house was completely dark, and Officer Blanton recalled hearing footsteps. On his way through the living room, Officer Campbell observed a child asleep on the couch. In the hallway, Officer Blanton observed Defendant pointing his hand at the officers like it was a gun and pulling the trigger. Then, Officers Campbell and Wilder heard Defendant make a statement similar in nature to, "I'm going to get you." Officer Campbell observed Defendant rolling from one side of the bedroom to the other side of the bedroom "with his hand out in a gun position screaming 'Bang, bang, bang.'" Officer Blanton recalled hearing Defendant verbally making the sound "pop, pop, pop." Officer Wilder described it as "Pow, pow, pow, pow." Officer Campbell "almost shot" Defendant, but noticed that Defendant did not have a weapon when he rolled into the door frame and his empty hands became visible. Next, the officers held Defendant at gunpoint while Officer Wilder handcuffed him. Defendant repeated, "They're going to get you. They're going to get you." Officer Blanton recounted Defendant repeating that there were people upstairs in the house that would kill them. Officer Wilder searched the attic of the house and found no one. Officer Campbell said that he was never able to ascertain to whom Defendant was referring. However, Officer Sparkman testified that Defendant "was purely convinced there w[ere] absolutely people upstairs to where I was very concerned for our safety."

When Defendant was detained, he was naked and covered in blood. Officer Blanton determined that Defendant had injuries to his feet from glass on the floor. Officer Blanton observed no other injuries to Defendant. After a short period of time, Officer Campbell accompanied Defendant on his way out to an ambulance and followed the ambulance to the hospital. Once at the hospital, Officer Campbell sat in the room with Defendant for several hours. During that time, Defendant asked some questions and denied any involvement, but Officer Campbell believed this to be typical of a suspect. Additionally, Officer Campbell believed that Defendant was coherent and understanding. Officer Campbell noted that Defendant's injuries were not proportionate with the large amount of blood on him.

Officer Blanton noticed "from the hallway all the way into the bedroom . . . the blood had saturated . . . the carpet." Officer Campbell recalled that there was blood "everywhere." Officers Blanton and Campbell recalled a "squishing" sound when a person stepped on the carpet. Investigator Jason Ferrell testified that in his twenty-four years of police experience, he had never seen more blood at a crime scene.

Stephen Pegram was the owner of the house rented by Defendant and the victim. Police called him to the scene after the attack. He said, "There was blood everywhere. . . . I have never seen anything like it. Every door in the back part of the house was completely covered. The wall, the wall had holes in it. The carpet had to be completely taken out. There was still flesh on the glass after[.]" He described the carpet as "drenched in blood." While he was cleaning up the property, Mr. Pegram found "a bag of pot and a bag of cocaine." Investigator Jason Kennedy recalled Mr. Pegram providing him with a wallet that was found at the scene. Inside the wallet was a bag containing a white powdery substance. Special Agent Denotria Patterson of the Tennessee Bureau of Investigation tested the white powdery substance found in the wallet that was recovered from the crime scene. The substance was 2.52 grams of cocaine.

Investigator Kennedy also recovered the neck portion of a Skol vodka bottle which was blood stained and had flesh attached to it. Special Agent Mike Turbeville of the Tennessee Bureau of Investigation analyzed the Skol bottle with reddish-brown stains recovered from the crime scene. The reddish-brown stains tested positive for blood that matched the victim's DNA.

Sometime after the attack, Defendant contacted the victim via text message and a letter. In the letter, Defendant asked if the victim had returned the movies to Hastings and stated that Defendant did not know what had happened. In the text messages, Defendant said that he didn't remember what had happened. The victim did not respond to Defendant's letter, but she sent Defendant a text message telling him to stop texting her.

*Defense Proof*

The defense began their case-in-chief by calling Sheila Parker, Defendant's mother. As an infant, Defendant was in the care of a family member, and he fell from a tall bed. This fall resulted in an injury and a "knot" on Defendant's head. At age five, Defendant fell from two levels of brick stairs and injured his head. Ms. Parker shared Defendant's family history of mental illness. Ms. Parker has two sisters that suffer from schizophrenia. Ms. Parker described one of her sisters as always "cut[ting] herself everywhere, and if she wasn't cutting herself, she was taking pills or jumping out of cars." Ms. Parker has another sister that attempted suicide. Ms. Parker's brother spent a

period of time in a mental hospital. Ms. Parker divulged that she was treated by a psychiatrist when she "stopped talking" after her sister died.

According to Ms. Parker, Defendant "had problems paying attention [and] being still." Ms. Parker was called to Defendant's school often because "he couldn't take instruction and follow instructions." She said, "His mind was always just going." From second through eighth grades, Defendant attended special education classes. Defendant went into State custody after the eighth grade. Defendant moved schools often because of his behavioral problems. At around the age of 12 or 13, Defendant began using different names which were associated with Defendant's different personalities.

When Defendant began referring to himself as "Michael," Defendant "started running away from the house, taking cars, climbing out the window, and he started doing stuff like that[.]" According to Ms. Parker, Defendant had a different look on his face when he was "Michael." Ms. Parker said, "Dexter . . . he is very religious. When he is 'Dexter,' he is real sweet, he is real kind, he's in the Word[.]" Ms. Parker said that "Dexter" "understands who [she] is and what's going on, but then when he turns Michael, it's like he just gets real rebellious and different[.]" As "Dexter," Defendant dressed in the "polo look" with "button-up shirts." However, as "Michael," Defendant wore a "white T-shirt" and "Dickey pants." "Michael" would call the police on himself to get arrested.

Defendant had another personality named "Nico." "Nico" had "big dreams and visions" and was an entrepreneur. However, "Nico" was "very depressed," "very nervous," and "very needy." Ms. Parker observed the victim calling Defendant by the name "Nico" in the early days of their relationship.

Defendant also had a personalities named "Yaheem," "Knowledge," and "J Rock." Ms. Parker described "Yaheem" as a cheater; he cheated on women and did not maintain relationships. "Knowledge" dressed in suits, traveled, and dated lawyers and school teachers. "Knowledge" had "millionaire friends." "J Rock" was Defendant's poet personality that worked in studios and rapped.

Ms. Parker said, "[M]entally, you could see that he was disturbed. He was always troubled. He would get into depressions. He would hide up under the bed, in the closet. It was like sometimes he would get in a ball . . . I couldn't help him." Ms. Parker described Defendant as going through a "total breakdown" when his grandparents died in a car accident in 2010. During the period of time after his grandparents passed, Defendant would frequently call Ms. Parker at all hours of the day and night. If no one answered the phone, Defendant would ramble to the answering machine. Ms. Parker revealed that this was when Defendant became "really depressed" and his "drinking seemed like it really took."

Ms. Parker attempted to get Defendant help, but each time that she tried, Defendant ended up back in jail before he could receive treatment. Ms. Parker said that she knew that Defendant needed medication. She claimed, "My whole family has been on medication. I am on medication, so you know, I knew he needed medication." According to Ms. Parker, Defendant was medicated while in jail, and once released, Defendant discontinued his medication and his problems returned. When on his medication, Defendant was "Dexter" and his other personalities went away. According to Ms. Parker, she could tell that Defendant had not been on his medication since he was last released from jail because he would identify himself as his alternate personalities when he called on the phone. While in jail and on medication, Defendant only ever identified himself as "Dexter."

Ms. Parker spoke to Defendant on the day of the attack. She attempted to get Defendant to travel with her to Oklahoma City. However, Defendant said that the victim did not want him to go. Ms. Parker said that she could tell from speaking with Defendant that "something wasn't right." Ms. Parker claims she told the victim, "[Defendant] needs some help, mentally needs some help." Ms. Parker testified that Defendant was "crying hard constantly," pacing, and saying "people was after him to get him." Describing Defendant, Ms. Parker said, "You could hear it in him that he was breaking down. You could hear it. He was running. He was hiding. He was shutting doors and locking doors. He was just panicked. He was just all over the place, and I wanted to get him some help." In the time leading up to the attack, Ms. Parker was not aware that Defendant had used cocaine.

Ms. Parker said that Defendant had been exhibiting odd behaviors his entire life. Ms. Parker was not aware of Defendant using drugs while living with her, but she admitted that it could have been possible.

Ms. Parker described Defendant being robbed before going to a church service on the Friday before the attack. She claimed that Defendant had a large sum of money that was given to him by his father and that someone robbed him and gave him a black eye. Ms. Parker explained that the person that robbed Defendant was an ex-boyfriend of the victim.

Dr. William Richie assessed the mental health of Defendant for this case. Dr. Richie was an assistant professor in the department of psychiatry at Meharry Medical College and was board certified in general and forensic psychiatry. Dr. Richie testified about Defendant's history of head trauma and stated that repeated head trauma increases the likelihood of memory lapses and can effect executive functioning, the ability to think about the consequences of one's actions. Dr. Richie agreed with Defendant's previous diagnosis of paranoid type schizophrenia. Additionally, Dr. Richie diagnosed Defendant

with psychotic disorder, not otherwise specified. Dr. Richie "did not ascribe to [Defendant] a diagnosis of dissociative identity disorder or multiple personality disorder."

Dr. Richie concluded to a reasonable degree of medical certainty that Defendant believed that people were trying to get him at the time of the attack. It was Dr. Richie's understanding that on the night of the attack, Defendant and the victim were watching the movies Transporter 3 and Avatar, using cocaine, and about to engage in sexual activity. At that point, Defendant heard a loud thump in the living room and "almost immediately lapses into a belief system that had him concerned for his physical safety. He develop[ed] the belief system, and he develop[ed] the perception that these aliens from this planet in the movie Avatar [we]re emerging from his television." According to Dr. Richie, Defendant then used "anything he had access to" in order to "repel these aliens from Avatar." Dr. Richie testified that Defendant could not remember anything but his despair "to repel these beings." Dr. Richie stated that the next thing Defendant recalled was the police coming into the room and arresting him. In Dr. Richie's opinion, Defendant "did not perceive any blood at all." According to Dr. Richie, Defendant's perceptual ability was diminished and "several of his organs of special sense were just off line: taste, touch, smell, [and] hearing. They were either off line, or they were inaccessible to him, or he was misperceiving, or he was outright hallucinating." Dr. Richie explained that cocaine can exacerbate active psychotic symptoms like hallucinations, delusions, paranoia, and agitation. In large doses, he said, cocaine can induce a mental state known as delirium. Dr. Richie opined that a person suffering from cocaine-induced delirium would have minimal access to their five special senses. According to Dr. Richie, Defendant sincerely believed that he was fighting the aliens from the movie Avatar because he "was laboring under the delusion that the hallucinatory Avatar beings were coming out of his TV, and he was combating them."

On cross-examination, Dr. Richie admitted that Defendant had told him in the first interview that the "thump" in the living room was one or more of the victim's friends. In this account of the night, Defendant told Dr. Richie that he was afraid that some of her friends were there to hurt him, and Defendant never mentioned the blue aliens from Avatar. Only in the second interview did Defendant mention blue aliens from the movie Avatar. Also in his first interview with Dr. Richie, Defendant never mentioned the broken bottle. However, Dr. Richie agreed that Defendant told the police that he broke a glass bottle and mentioned having a bottle in his hand in the second interview with Dr. Richie.

Before Dr. Richie was allowed to testify to his conclusions on direct examination, the State moved for exclusion of his finding on the ultimate issue in the case. In his expert report, Dr. Richie stated, "With regard to Dexter Parker's mental condition at the time of the alleged offense, it is my opinion within a reasonable degree of psychiatric

certainty that the information is clear and convincing that at the time of the commission of the acts constituting the alleged offenses, severe mental disease or defect did prevent the defendant from appreciating the nature and wrongfulness of such actions pursuant to [T.C.A. §] 39-11-501." The State also pointed out Dr. Richie's conclusion regarding how Defendant's voluntary intoxication "could possibly negate the specific intent to commit the alleged offense." The State asserted that both of these opinions were issues to be resolved by the jury. Ultimately, the trial court referenced *State v. Perry*, 13 S.W. 3d 724 (Tenn. Crim. App. 1999) and ruled that Dr. Richie's conclusion was inadmissible because it was almost verbatim the conclusion that was excluded in *Perry*. Defense counsel attempted to change the language in the report by exchanging the words "did prevent" for "could have prevented," but the trial court determined that would be inadmissible as well. In one last attempt, defense counsel attempted to get the trial court to approve language stating that the "severe mental disease or defect affected the defendant." The trial court did not approve that wording of the conclusion either. Thus, Dr. Richie's conclusion was redacted from his report that was entered as evidence.

The defense then called Dr. Rokeya Farooque, a forensic psychiatrist for the Middle Tennessee Mental Health Institute. Dr. Farooque diagnosed Defendant with schizophrenia, paranoid type. As a result of this diagnosis, Dr. Farooque prescribed three different medications. Dr. Farooque explained that in her analysis of Defendant, she had to determine if his actions were a result of his mental illness or simply a fear that resulted from a beating from some associates of the victim that Defendant incurred a few days before the attack. Put another way, the question Dr. Farooque sought to resolve was whether Defendant suffered from the symptoms of his mental illness at the time of the attack on the victim. Dr. Farooque was unable to connect Defendant's actions to his mental illness. Rather, she determined that Defendant became paranoid about being attacked by associates of the victim and that he attacked the victim as a result of that paranoia. According to Dr. Farooque, there was "no other logical explanation." Dr. Farooque attributed some of Defendant's stranger actions—pointing his fingers while making gun sound effects and acting "fidgety"—to Defendant's drug and alcohol use. This was evidenced by the fact that Defendant's actions returned to relative normalcy after a short passage of time when Defendant was able to ask, "What kind of charges [do] I have?" According to Dr. Farooque, Defendant "knew what he was doing." Thereby, she determined there was no basis for an insanity defense. Dr. Farooque's opinion to a reasonable degree of medical certainty was that neither intoxication nor mental illness had any effect on Defendant's ability to know what was going on at the time of the attack.

Crucial to this appeal, Dr. Farooque made the following statement to which defense counsel initially objected:

So the things that we formulate – we do the formulation of what happened.
. . . [T]hey were doing powder – for last several days, they were doing
powder. Then that day, he went out to drop, I think, children and then got
some movies to come [sic]. Those were – those were normal behaviors.
There was nothing – yes, he had severe mental illness, but those behaviors
were not anything from mental illness. He went out. He dropped children.
He rented some movies and came back. They were doing powder. Both of
them got into argument, and then he thought that she is calling somebody to
beat him up, and he started beating her, so there – I did not and we did not,
me and Dr. Mount, we both did not see the mental illness has to do
anything that is going to prohibit him from understanding –

After the trial court reminded defense counsel of his earlier ruling referencing *Perry*
during the testimony of Dr. Richie, defense counsel withdrew his objection and asked Dr.
Farooque to continue her answer in response to his question about whether she attributed
Defendant's actions to something other than mental illness.

Dr. Farooque admitted that heavy cocaine use can affect one's ability to appreciate
the wrongfulness of an action and one's ability to remember specific events. Dr.
Farooque also opined that alcohol or marijuana use in conjunction with cocaine use
enhances the effects of cocaine.

Dr. Farooque disagreed with Dr. Richie's opinion. Dr. Farooque's opinion was
that Dr. Richie should not have diagnosed Defendant with "psychotic disorder, not
otherwise specified" in addition to Defendant's schizophrenia diagnosis. Related to Dr.
Richie's conclusion about Defendant believing blue aliens were coming out of his
television, Dr. Farooque never heard Defendant mention blue aliens from Avatar during
Defendant's thirty-day stay at Middle Tennessee Mental Health Institute.

At the conclusion of the trial, the jury convicted Defendant of attempted second
degree murder as a lesser-included offense in Count One, aggravated assault in Count
Two, and especially aggravated kidnapping in Count Three. Defendant received a
sixteen-year sentence for Count One, an eight-year sentence for Count Two, and a
twenty-two year sentence for Count Three. Each sentence was consecutive to the others,
resulting in a forty-six year total effective sentence. The trial court denied Defendant's
motion for new trial, and this appeal followed.

*Analysis*

*I. Expert Testimony*

Defendant argues that the trial court erred by misinterpreting *Perry* and allowing Dr. Farooque to testify as to Defendant's state of mind at the time of the crime in contravention of Tennessee Code Annotated section 39-11-501(c). Additionally, Defendant contends that the trial court erred by not allowing Dr. Richie to testify as to his conclusion regarding Defendant's state of mind as a rebuttal to the testimony of Dr. Farooque. The State argues that appellate review of this issue has been waived because Defendant invited the alleged error. We agree with the State.

We are not required to grant relief to "a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error." Tenn. R. App. P. 36(a). "It has long been settled in Tennessee that a party cannot take advantage of errors which he himself committed or invited, or induced the trial court to commit, or which were the natural consequence of his own neglect or misconduct." *State v. Garland*, 617 S.W. 2d 176, 186 (Tenn. Crim. App. 1981); Tenn. R. App. P. 36(a).

At the outset of our discussion of this issue, we want to reiterate that both expert witnesses were called by the defense during the defense's case-in-chief. Defendant's brief is written in a manner that would lead one to believe that the State called Dr. Farooque during the State's case-in-chief. Such was not the case.

During defense counsel's direct examination of Dr. Farooque, defense counsel objected to an answer given by the witness in response to his own question. However, after a brief sidebar with the judge, defense counsel withdrew the objection. After the objection, defense counsel did not try to steer Dr. Farooque away from the topic, nor did he move for that portion of her testimony to be stricken. Rather, defense counsel merely said, "Continue, please, Dr. Farooque[,]" and Dr. Farooque continued to explain her conclusion that was the subject of the withdrawn objection. If the trial court erred by allowing Dr. Farooque's testimony, defense counsel not only failed to take the appropriate action to prevent or nullify the harmful effect of the error, he invited it. Defense counsel could have maintained his objection, moved to strike the testimony, asked a question about a different topic, or simply sat down and quit asking questions of an expert witness whose conclusion was adverse to his client. Yet, he did none of the above. Thus, full appellate review of the issue is waived.

Furthermore, we refuse to entertain a plain error analysis because Defendant has failed to show that the issue was not waived for tactical reasons. *See State v. Page*, 184 S.W.3d 223, 230-31 (Tenn. 2006) (quoting *State v. Terry*, 118 S.W. 3d 355, 360 (Tenn. 2003)) (setting forth the five factors that must be present for plain error review including that the issue was not waived for tactical reasons). The reasoning behind defense counsel's decision to withdraw his objection is not set forth in the record or argued in the briefs. Defense counsel did not merely fail to object out of inattention or negligence.

- 13 -

Defense counsel made a conscious decision to withdraw the objection and allow her to continue testifying on the subject. We refuse to believe that defense counsel withdrew the objection without some reason for doing so. While withdrawing the objection and waiving appellate review might not have been a wise tactical decision in this case, it could have been a tactical decision nonetheless.

## II. The Indictment

Defendant also argues that the trial court erred by reinstating Count Two of the indictment and allowing the State to constructively amend the indictment after dismissing it. The State contends that the original indictment was adequate and that the trial court did not violate the Double Jeopardy Clause by reversing its initial finding that the charge of aggravated assault could not be presented to the jury. While we appreciate the trial court's efforts to ensure that things were done properly, the State's indictment, as drafted, resulted in a procedural quagmire that is difficult to sift through. Nonetheless, after quite a bit of sifting, we discern errors were made with regard to Count Two of the indictment. The trial court erred by dismissing the indictment, reinstating the indictment, and amending the indictment.

"The Sixth and the Fourteenth Amendments to the United States Constitution and Article I, § 9 of the Tennessee Constitution guarantee the accused the right to be informed of the nature and cause of the accusation." *Wyatt v. State*, 24 S.W.3d 319, 324 (Tenn. 2000) (citing U.S. Const. amend.VI, XIV; Tenn. Const. art. I, § 9; *State v. Hill*, 954 S.W.2d 725, 727 (Tenn. 1997)). "An indictment is an accusation in writing presented by the grand jury of the county charging a person with an indictable offense." T.C.A. § 40-13-101. "The grand jury has inquisitorial powers over – and has the authority to return a presentment – of all indictable or presentable offenses found to have been committed or to be triable within the county." Tenn. R. Crim. P. 6(d). The grand jury derives its "independent inquisitorial power" directly from Article I, § 14 of the Tennessee Constitution, which provides "[t]hat no person shall be put to answer any criminal charge but by presentment, indictment or impeachment." *State v. Superior Oil, Inc.*, 875 S.W.2d 658, 661 (Tenn. 1994). The Tennessee Code requires an indictment to "state the facts constituting the offense in ordinary and concise language, without prolixity or repetition, in a manner so as to enable a person of common understanding to know what is intended and with that degree of certainty which will enable the court, on conviction, to pronounce the proper judgment." T.C.A. § 40-13-202; *State v. Lindsey*, 208 S.W.3d 432, 438 (Tenn. Crim. App. 2006). In order to be constitutional an indictment must "1) provide notice to the accused of the offense charged; 2) provide the court with an adequate ground upon which a proper judgment may be entered; and 3) provide the defendant with protection against double jeopardy." *Lindsey*, 208 S.W.3d at 438 (quoting *Wyatt*, 24 S.W.3d at 324) (citations omitted).

- 14 -

In response to the trial court's inquiry about the indictment at trial, Defendant initially argued that "domestic aggravated assault" was not a crime and thus, the indictment did not charge an offense. This initial challenge to the indictment was still timely because "at any time while a case is pending, the court may hear a claim that the indictment, presentment, or information fails to show jurisdiction in the court or to charge an offense." Tenn. R. Crim. P. 12(b)(2)(B). If the indictment had actually failed to charge an offense, the dismissal would have been proper. However, later in the argument about the indictment, defense counsel changed his position and argued that the indictment was impermissibly duplicitous, charging both domestic assault and aggravated assault. The duplicitousness of an indictment is a non-jurisdictional defect which must be challenged in a motion before trial. *State v. Duran Maszae Lee*, No. E2017-00368-CCA-R3-CD, 2018 WL 934534, at*4 (Tenn. Crim. App. Feb. 16, 2018), *perm. app. denied* (Tenn. June 6, 2018); Tenn. R. Crim. P. 12(b)(2)(A); *see also State v. Michael Burnette*, No. E2005-00002-CCA-R3-CD, 2006 WL 721306, at *3 (Tenn. Crim. App. Mar. 22, 2006), *perm. app. denied* (Tenn. Sept. 5, 2006); *State v. Donald Richardson*, No. 87-192-III, 1988 WL 52670, at *1 (Tenn. Crim. App. May 24, 1988), *no perm. app. filed.* Defendant's argument that the indictment was duplicitous was untimely, waiving the issue. Therefore, when the trial court dismissed Count Two of the indictment on this ground, though it was temporary, it was error.

Apparently realizing this error, the trial court recanted its ruling and reinstated Count Two of the indictment. Yet, this too was error. A dismissal of charge in an indictment is a termination of that particular prosecution. *See State ex rel. Hobbs v. Murrell*, 93 S.W.2d 628, 630 (Tenn. 1936) (quoting *Scheibler v. Steinburg*, 167 S.W. 866, 866 (Tenn. 1914)). Once an indictment has been dismissed, the only way that a conviction can be had is by beginning the case anew, in this scenario, with an indictment by a grand jury. *See State v. Neely*, 1 S.W.3d 679, 682 (Tenn. Crim. App. 1999) (stating that an unconditional nolle prosequi resulting in dismissal of the indictment required "beginning a new case against the accused"); *see also Murrell*, 93 S.W.2d at 630; *State v. John Ruff*, No. W1999-01536-CCA-R3-CD, 2001 WL 58732, at*2 (Tenn. Crim. App. Jan. 19, 2001), *no perm. app. filed*; *State v. D'Anna*, 506 S.W.2d 200, 202 (Tenn. Crim. App. 1973). While a violation of a condition of a conditional nolle prosequi allows a trial court to reinstate an indictment because the condition is necessary for the dismissal to take effect, *Neely*, 1 S.W.3d at 682, no such condition precedent existed to the dismissal in this case. The trial court dismissed the indictment from the bench outright. After the dismissal, further testimony was elicited from a witness before Count Two was reinstated. To permit outright dismissals and reinstatements of indictments by the trial court absent some condition precedent could yield absurd scenarios where a trial court dismisses an indictment prior to opening statement and reinstates the indictment just before closing argument. Thus, the trial court erred in its reinstatement of the indictment because the case did not begin anew.

We recognize that our supreme court and this Court have reinstated indictments on appeal. It appears that our supreme court has reinstated an indictment on one occasion in *State v. Sherman*, 266 S.W.3d 395 (Tenn. 2008), and this Court has reinstated indictments numerous times with *State v. Roy Lee Ellis*, No. W2017-00699-CCA-R3-CD, 2018 WL 673387, at *7 (Tenn. Crim. App. Jan. 31, 2018), *no perm. app. filed*, being the most recent at the time of writing. However, it is important to note that what occurred in this case is different than what occurs when an appellate court reinstates an indictment after it has been dismissed in error. When an appellate court reinstates an original indictment, the defendant is placed in the same position that he was in on the day that the grand jury issued the indictment. In other words, the case begins anew. As occurred in this case, a mid-trial reinstatement of an indictment, especially when testimony has been elicited between the dismissal and reinstatement, does not afford the defendant the same procedural protections.

Nevertheless, the trial court reinstated the indictment. Thereafter, the trial court speculated as to what the indictment should have said. Though the trial court indicated that it would not "permit an amendment," the trial court dismissed the "part of the indictment that appears to try to allege the domestic enhancer."

Tennessee Rule of Criminal Procedure 7 bars amendment of an indictment after jeopardy has attached without the defendant's consent. Tenn. R. Crim. P. 7(b)(2). Black's Law Dictionary defines amendment as "[a] formal and usually minor revision or addition proposed or made to a statute, constitution, pleading, order, or other instrument; specifically, a change made by addition, *deletion*, or correction[.]" Amendment, *Black's Law Dictionary* (10th ed. 2014) (abbreviations omitted and emphasis added). Additionally, this Court has held that the deletion of words from an indictment is an amendment. *See Lindsey*, 208 S.W.3d at 439 (holding that the trial court erred in allowing the State to amend the indictment to delete the phrase "and or deliver"). By dismissing "part of the indictment," the trial court essentially "deleted" the portion of the indictment that used the word "domestic" and the citation to the domestic assault statute. Defendant did not consent to the amendment. Thus, the trial court erroneously amended the indictment.

This combination of reinstatement and amendment of the indictment encroaches on the grand jury's sole power to indict offenses derived from the Tennessee Constitution. *See* Tenn. Const. Art. I, § 14; T.C.A. § 40-13-101 (stating that indictments are "presented by the grand jury"); Tenn. R. Crim. P. 6(d) (stating "The grand jury has inquisitorial powers over . . . all indictable or presentable offenses . . . ."); *Superior Oil, Inc.*, 875 S.W.2d at 661 (characterizing the grand jury's power as "independent" and derived from Article I, § 14 of the Tennessee Constitution). The culmination of the trial court's actions resulted in a new indictment against Defendant being introduced by the trial court in the middle of the trial on that indictment. Alas, we are left with but one

conclusion: the trial court lacked the power to reinstate and amend the indictment once it was dismissed, even if it had been originally dismissed in error.

Now that we have determined that the trial court erred, we must determine the magnitude of the errors. Our supreme court has recognized three categories of error: structural constitutional error, non-structural constitutional error, and non-constitutional error. *State v. Rodriguez*, 254 S.W.3d 361, 371 (Tenn. 2008). The following description of structural constitutional errors was given by our supreme court in *Rodriguez*:

> Structural constitutional errors are errors that compromise the integrity of the judicial process itself. They involve defects in the trial mechanism. These errors "deprive defendants of 'basic protections' without which 'a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence . . . and no [such] criminal punishment may be regarded as fundamentally fair.'" Examples of structural constitutional errors include the complete denial of the right to counsel, racial discrimination in the selection of a grand jury, denial of the right of self-representation at trial, and denial of the right to a trial by jury. Structural constitutional errors are not amenable to harmless error review, and therefore, they require automatic reversal when they occur.

*Id.* (internal citations omitted). Our discussion of the categories of error need go no further. Unlike the mere amendment of an indictment that this Court held was harmless in *Lindsey*, the combination of errors that occurred in this case compromised the integrity of the judicial process by encroaching on the independent power of the grand jury. Once the trial court reinstated and amended Count Two, Defendant faced a charge that did not result from an indictment by the grand jury, and he was not afforded the pre-trial procedural process that occurs when the case begins anew with a new indictment. We are left with no option but to reverse the judgment of the trial court and vacate Defendant's conviction in Count Two.

*Conclusion*

For the aforementioned reasons, we reverse the judgment of the trial court and vacate Defendant's conviction in Count Two and affirm the judgments of the trial court in Counts One and Three.

_____
TIMOTHY L. EASTER, JUDGE